UNITED STATES of America,
Plaintiff-Appellee,

v.

Keith CANADY, Defendant-Appellant.

No. 79–5169.

United States Court of Appeals,
Fifth Circuit.

April 18, 1980.

P. Bruce Kirwan, Federal Public Defender, J. Richard Young, Atlanta, Ga., for defendant-appellant.

Charles S. Saphos, William R. Toliver, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Keith Canady was convicted of one count of unlawfully and knowingly possessing with intent to distribute heroin hydrochloride. 21 U.S.C.A. § 841(a)(1). Canady was sentenced to three years in prison to be followed by three years special parole. He appealed his conviction on the grounds that the district court erred in denying his Motion to Suppress a quantity of heroin seized at the Atlanta Airport. Finding no error, we affirm.

## I. FACTS

Canady arrived at Hartsfield International Airport in Atlanta, Georgia, in the early morning hours of October 31, 1978, on an Eastern flight from Los Angeles, California. His destination was North Carolina. At approximately 4:40 A.M., Canady, preparing to depart Atlanta on Piedmont Airlines, approached the only passenger checkpoint open at that time. He was carrying a suitcase and a sack containing a figurine. The checkpoint was manned by Officer Betty Jane LeStage, an employee of ARC Security, a private company. At this early hour in the morning, Officer LeStage would check not only baggage but tickets as well to insure that only passengers went onto the concourse. Officer LeStage noted from Canady's ticket that he was scheduled to leave on a Piedmont flight to North Carolina. Officer LeStage then asked Canady if she could search his suitcase and he replied yes. Because the x-ray machines were customarily turned off at that time of morning, Officer LeStage had to inspect Canady's baggage by hand. She had difficulty opening the lock on the left side of the suitcase and asked Canady if it was locked. Canady replied that it was not locked, but one had to hit it in order for it to open. He proceeded to hit the suitcase which allowed Officer LeStage to open it.

While looking through the suitcase, Officer LeStage encountered a. brown paper bag beneath the clothing containing two cylindrical packages. Because the cylindri-

cal packages were completely wrapped in tape, Officer LeStage took a "still shot" of the package with the x-ray machine. Because the x-ray examination did not rule out explosives or other contraband, she asked Canady what they were. Canady replied that he did not know. Officer LeStage then asked him to open the cylindrical packages so that she could determine their contents and let him through the checkpoint. With this request, Canady became very nervous and replied, "Well, that's not mine; that's not mine," referring both to the suitcase and to the package. Officer LeStage placed the package back in the suitcase, closed the suitcase, and directed Canady to return the suitcase to the Eastern ticket counter. Officer LeStage gave Canady directions to the ticket counter and last observed him walking in that direction.

Officer LeStage waited 15 minutes and Canady did not return. She became concerned because she knew Canady's flight was scheduled to leave shortly that morning. She suspected that Canady would try to pass through a checkpoint on the Eastern concourse which had opened in the interim. Officer LeStage telephoned Officer Rachel Short, also an employee of ARC Security, who was manning the Eastern checkpoint. Officer LeStage described Canady to Officer Short and said that he had a package in his suitcase which he would not allow Officer LeStage to inspect. Officer LeStage asked Officer Short to be on the lookout for Canady. As Officer Short ended her conversation with Officer LeStage, Canady approached the Eastern checkpoint. Since the x-ray machine was operating at this checkpoint, Canady's bag was run through it. After the suitcase went through the machine on the conveyer belt, Officer Short asked Canady if she could open it. He replied yes and helped Officer Short open the suitcase. When the suitcase was opened, Officer Short found the bag containing the wrapped cylinders under some clothing. Officer Short asked Canady what the bag contained and he replied he did not know and that he was trying to return the suitcase to Eastern as it was not his. Officer Short then put the cylindrical objects

through the x-ray machine. She again asked Canady what the cylindrical objects contained. He repeated that he did not know. Officer Short returned the cylindrical objects to the paper bag and placed the paper bag back in the suitcase.

Canady at this time took the suitcase and began to walk away from the checkpoint down the Eastern concourse. Because Officer Short could not leave the checkpoint as other passengers were waiting in line to be screened, she called two Atlanta policemen on duty nearby, telling them that Canady had a package and had said he did not know what was in it. Officer Short also told the policemen that Canady had said the package did not belong to him and that he would not open the package.

Officer William Mangrum of the Atlanta Police Department was one of the officers on duty near Officer Short's checkpoint and responded to her call. Officer Mangrum's duties were to prevent weapons, explosives, and articles which could be used in hijacking from passing the checkpoint. When Officer Short reported to Officer Mangrum that Canady refused to let her check the package, Officer Mangrum called to Canady several times, directing him to stop. Canady stopped, turned and approached Officer Mangrum. Officer Mangrum asked Canady if he had refused to let the security guard check a package, to which Canady replied that he had to catch a plane. Officer Mangrum then asked Canady to come back to the checkpoint so that the package could be checked. As they walked back to the checkpoint, Canady told Officer Mangrum that the suitcase was not his. Once Canady and Officer Mangrum had returned to the checkpoint, Officer Mangrum asked Canady to open the suitcase, which he did. Officer Mangrum found the paper bag inside the suitcase and asked Canady to open the bag. Canady refused to open the paper bag. After the third request to open the bag and the third refusal, Mangrum opened the bag and found the two cylindrical objects. Officer Mangrum noted that the two objects felt grainy, and at this point had Agent Markonni of the Drug Enforcement Agency

paged. Officer Mangrum then asked Canady to sit down. At that time, Canady again told Officer Mangrum that the suitcase was not his.

When Agent Markonni arrived at the checkpoint, he saw the paper bag open, lying on top of the clothing in the suitcase. Officer Mangrum asked Agent Markonni to look in the paper bag, which he did and saw two cylindrical objects wrapped with tape. Agent Markonni took the two cylindrical objects out of the bag, felt and smelled them. Agent Markonni noted that the odor resembled that of heroin, that the granular or powdery consistency of the contents which he could feel was common in narcotic trafficking, and that the completely tape-wrapped package was a common method of packaging heroin transported by couriers. Agent Markonni asked Canady what was in the cylindrical objects, to which Canady again replied that he did not know as the suitcase was not his. Agent Markonni asked Canady if he had any identification, to which Canady replied he did not. After Agent Markonni briefly interviewed Officer Short, he arrested Canady. Thereupon, Agent Markonni and Officer Mangrum took Canady to Agent Markonni's office in the airport terminal where one of the cylindrical objects was opened and its contents field-tested. There was a positive reaction for the presence of an opiate.

## II. RIGHT TO CHALLENGE SEARCH

We conclude that Canady did not have a legitimate expectation of privacy in the suitcase and its contents and therefore cannot object to the seizure of the heroin. Our decision is controlled by *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and by this Court's holdings in *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973) (en banc) and *United States v. Anderson*, 500 F.2d 1311 (5th Cir. 1974).[1]

In *Colbert*, the police recognized the two defendants as suspected felons. As the police approached the defendants, the defendants set the briefcases they were carrying down on the sidewalk. In response to questions, the defendants denied that they owned the briefcases or had any knowledge about them, and began to walk away from the officers, leaving the briefcases on the sidewalk. When the defendants were unable to produce draft cards at the officer's request, the officers arrested the defendants for failure to carry Selective Service Registration Cards, and placed them in the patrol car. The police then opened the briefcases, finding sawed-off shotguns inside. The defendants were convicted for possession of unregistered sawed-off shotguns. The Fifth Circuit, sitting en banc, affirmed their convictions, holding that defendants had abandoned the briefcases, and thus had no standing to challenge the search.

In *Anderson*, defendant Spicer was arrested in an airport after having checked certain bags. Upon his arrest, the police took the baggage claim checks from his ticket and recovered two bags from the plane. The defendant claimed ownership of one of the bags, but disclaimed ownership of the other. The bags and the defendant were taken to the police station where the luggage was opened and searched without a warrant. The unclaimed suitcase contained a pistol with defendant's thumbprint on the holster, and other incriminating evidence. The defendant was convicted of a narcotics felony, and of carrying a firearm during the commission of a felony. This Court, citing *Colbert* as controlling, held that the pistol and other contents of the unclaimed bag were admissible because defendant had abandoned the bag. Thus defendant had no

---

1. Compare *United States v. Miller*, 589 F.2d 1117 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), where the defendant, after being arrested, opened the door of a vehicle which contained baggage. Although the defendant denied ownership of one of the bags, he opened that bag with the correct combination on the lock. Marijuana

was found inside that bag and the defendant was convicted of possession with intent to distribute. The First Circuit cited *Anderson* and *Colbert* with approval for the proposition that the defendant had no standing to challenge the search of the disclaimed bag.

See also *Lurie v. Oberhauser*, 431 F.2d 330 (9th Cir. 1970), cited by *Colbert*.

expectation of privacy and lacked standing to challenge the search of the unclaimed suitcase.

This Circuit's *Colbert* and *Anderson* decisions speak in terms of the defendant's "standing" to challenge the search. The Supreme Court in *Rakas* discarded that terminology in favor of an inquiry into the substantive question of whether a defendant has a "legitimate expectation of privacy," 439 U.S. at 143, 99 S.Ct. at 430, protected by the Fourth Amendment. The Supreme Court stated: "But we think the better analysis [to determine whether a defendant may challenge a search] forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Id.* at 139, 99 S.Ct. at 428. The Supreme Court, however, made it clear that "[t]he inquiry under either approach is the same" *Id.* at 139, 99 S.Ct. at 428. Accordingly, the holdings in *Colbert* and *Anderson*, that a defendant has no standing to challenge the search of an abandoned briefcase or an unclaimed suitcase, are "properly subsumed," *Id.* at 139, 99 S.Ct. at 428, under the *Rakas* analysis utiliz-

ing the concept of no legitimate expectation of privacy in the abandoned or unclaimed items.

In the instant case, Canady disclaimed ownership of the suitcase, first to Officer LeStage at the first checkpoint, again to Officer Short at the second checkpoint, then to Officer Mangrum as Canady and Mangrum walked back to the second checkpoint, again to Officer Mangrum after the suitcase had been searched, and finally to Agent Markonni.[2]

We hold here, as in *Colbert* and *Anderson*, that Canady abandoned the suitcase,[3] and, applying the *Rakas* analysis, we hold that Canady had no legitimate expectation of privacy in the suitcase or its contents. He had no expectation of privacy deriving from a property interest[4] or from any understanding "recognized and permitted by society," 439 U.S. at 144, n. 12, 99 S.Ct. at 431, because he had abandoned the suitcase.

Therefore, Canady cannot challenge the searches involved in this case[5], and his conviction is accordingly .

AFFIRMED.

2. At his trial, Canady maintained his disclaimer, testifying that he did not own the suitcase and knew nothing about it.

3. Because the facts of this case fall well within the holdings of *Colbert* and *Anderson*, our decision today in no way amounts to an extension of the abandonment theory as enunciated by these two cases. We note that the searches by Officers LeStage, Short and Mangrum are clearly within the scope of airport searches which have been approved by this Court. *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973). In his brief, Canady concedes that the searches by airport Officers LeStage and Short are legal. Officer Mangrum's actions fall within the scope of *Skipwith* as he was merely completing an unfinished airport search. In calling Canady back to the checkpoint, and in opening the suitcase and the brown paper bag, Officer Mangrum was acting consistent with a concern for the safety of airline passengers. Accordingly, Canady's disclaimers occurred in the context of legal and proper airport searches, and were not prompted by any illegal action on the part of law enforcement officials. The disclaimers were voluntary, falling well within the guidelines established by *Colbert* and *Anderson*.

4. The Supreme Court reaffirmed that "distinctions developed in property . . . law . . . ought not to control" 439 U.S. at 143, 149, n. 17, 99 S.Ct. at 434, n. 17. The Court also stated: "Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were rejected both in *Jones*, [*Jones v. U. S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697] *supra*, and *Katz*, [*Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576] *supra*. But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." *Id.* at 144, n. 12, 99 S.Ct. at 431 n. 12.

5. It is unclear exactly which search is being challenged on appeal. We noted in footnote 3 above that Canady does not challenge the searches by Officers LeStage and Short. In his Motion to Suppress, Canady attacked a search only of "DEA agents." In his brief on appeal, Canady challenges the search by Officer Mangrum, without apparently challenging the search

and seizure by Agent Markonni. At oral argument, counsel for Canady did contend that a search of a container after an arrest without a search warrant would be illegal, *i. e.*, an attack on the search by Agent Markonni. We have considered both searches and find no expectation of privacy in the suitcase or its contents with respect to the search by either Officer Mangrum or Agent Markonni. Because we hold that Canady cannot challenge the search by Agent Markonni, we do not reach the question of whether Markonni's opening of the wrapped cylindrical object was within the scope of a proper airport search or whether other exigent circumstances permitted its opening without a warrant. We express no opinion on these questions. *Compare United States v. Palazzo*, 488 F.2d 942 (5th Cir. 1974); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).