UNITED STATES of America, Plaintiff,

v.

Delphine O. TOLBERT, Defendant.

Crim. No. 80–80253.

United States District Court,
E. D. Michigan, S. D.

June 29, 1981.

Gary M. Felder, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Isaiah King, Houston, Tex., for defendant.

## OPINION

FEIKENS, Chief Judge.

Defendant Delphine Tolbert is charged with possession of about 280 grams of cocaine, a violation of 21 U.S.C. § 841(a)(1). She brings this motion to suppress evidence which was seized at the time of her arrest. The parties have agreed to a stipulation of the facts.

On March 28, 1980, defendant traveled from Miami to Detroit on a commercial airline flight, changing planes in Atlanta. At the airport in Atlanta, she was observed as she deplaned from her first flight by Special Agent Gerald Chapman of the Drug Enforcement Administration ("DEA") and Officer James Burkhalter of the Atlanta Police Department. Defendant noticed that Chapman was watching her. She reacted with a look of concern.

Chapman and Burkhalter followed defendant as she walked from this arrival area to the departure gate for her connecting flight to Detroit. Chapman watched her check in for the second flight. He learned from this observation that defendant had one piece of checked luggage, that she had paid for her ticket in cash, and that her ticket had been handwritten. He also learned that she was traveling under the name of L. Jones. Using this information, he was able to learn from the airline that defendant had purchased her ticket about twenty minutes before her flight had left Miami.

Based on this information, which fit the DEA's "drug courier profile", Chapman and Burkhalter approached defendant. Chapman identified himself as a DEA agent, and asked defendant for her airline ticket and a piece of identification. Defendant handed Chapman her ticket folio, which contained a roundtrip ticket from Miami to Detroit and a baggage claim check with the number 387–945 on it. She stated that her identification was in the checked luggage. Chap-

man asked her a few questions. He stated again that he was a narcotics agent, and that he was trying to determine whether or not she was transporting illegal drugs. Defendant became nervous, and denied that she was doing so. Chapman asked for permission to search her pocketbook and luggage, but defendant refused. The conversation ended, and Chapman notified the Detroit DEA Airport Detail of what had occurred.

When defendant arrived in Detroit, DEA Special Agent Bruce Bryda and other agents recognized her from Chapman's description, and continued the surveillance. Defendant left the arrival gate and walked toward the baggage claim area. The agents followed. They observed her looking around as though she was trying to determine whether someone was following her. She passed through the baggage claim area without claiming any baggage, then walked outside. Her pace quickened as she approached a taxi.

As defendant was getting into the taxi, Bryda and Special Agent Anderson approached her. They identified themselves and asked for her ticket and some identification. She handed them her ticket folio, but said she did not have any identification. Bryda observed that the baggage claim check, previously observed by Agent Chapman in Atlanta, was now missing. He informed her that they believed that she was carrying narcotics, and asked her to step inside the terminal so they could ask her some more questions.

Once inside the terminal, Bryda asked defendant if she had any luggage. She said that she did not. By this time, all of the luggage from the flight from Atlanta had been claimed, except for one bag. Bryda examined the bag, and noted that the claim number corresponded to the number which Chapman had observed on defendant's ticket folio when he had stopped her in Atlanta. Bryda claimed the bag, and brought it to the airport DEA office.

In the office, Bryda asked defendant if he could search her purse. She consented. He then asked her if the checked luggage belonged to her. She denied it. Agent Anderson then searched her purse and discovered a pictured card which identified her as Delphine Tolbert, not L. Jones, as her ticket had indicated. He also found a set of keys. Bryda opened the luggage with one of the keys, and discovered cocaine. He then formally placed defendant under arrest and advised her of her rights.

Defendant argues that the evidence must be suppressed for two reasons. First, she argues that the confrontation with Chapman and Burkhalter in Atlanta was a "stop" not predicated upon reasonable suspicion, see, e. g., Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1881, 20 L.Ed.2d 889 (1968), and that the evidence was a "fruit" of this stop, see, e. g., Wong Sun v. United States, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–417, 9 L.Ed.2d 441 (1963). The government maintains that no Fourth Amendment "stop" occurred there, or, in the alternative, that it was justified by reasonable suspicion. Second, defendant argues that even if the first stop was proper, the evidence must be suppressed because the search of the luggage without a search warrant violated her Fourth Amendment rights. See, e. g., Arkansas v. Sanders, 442 U.S. 753, 757–61, 99 S.Ct. 2586, 2589–2592, 61 L.Ed.2d 235 (1979); United States v. Chadwick, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977). The government responds that, even though Bryda conducted the search without a warrant and without probable cause, no right of defendant was violated because she had "abandoned" the luggage.

I find that defendant did not abandon her luggage. The search violated her Fourth Amendment rights. Thus, the evidence must be suppressed. Weeks v. United States, 232 U.S. 383, 393–94, 34 S.Ct. 341, 344–345, 58 L.Ed. 652 (1914), overruled on other grounds, Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). For this reason, I do not need to decide the constitutionality of the first confrontation between defendant and Chapman and Burkhalter in Atlanta. In light of the case law on "abandonment", however, I

will clarify the precise nature of my holding.

The theory of "abandonment" in Fourth Amendment cases appears to have originated in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In *Hester*, revenue officers hid near the front of a farmhouse owned by Hester's father. Hester walked out of the house and handed a quart bottle to someone named Henderson. An alarm was sounded, and the revenue officers began to run toward the two men. Hester grabbed a gallon jug from a nearby car and ran off across an open field. Henderson followed, carrying the bottle Hester had given him. One of the officers pursued them and fired a shot into the air. Hester dropped the jug and it broke. Henderson tossed his bottle away. Both continued to run. The officers seized the remnants of both containers. They were found to contain moonshine whiskey. Despite the absence of a search warrant, the Supreme Court affirmed Hester's conviction for concealing distilled spirits. They said:

> It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. This evidence was not obtained by the entry into the house and it is immaterial to discuss that. . . .

[A]part from the justification, the special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers, and effects" is not extended to open fields. The distinction between the latter and the house is as old as the common law.

265 U.S. at 58–59, 44 S.Ct. at 446.

*Hester* may be interpreted in either of two ways. First, Hester and Henderson may have "abandoned"[1] the containers by dropping or tossing them away as they ran. Second, the Fourth Amendment may have been considered irrelevant to any search of an open field, or seizure of evidence found there. If *Hester* stood for the first proposition, it would provide strong support for the government's position that defendant "abandoned" her luggage. I conclude, however, that it is explained better by the second theory. The language of the opinion lends itself more readily to that interpretation. The final sentences quoted above sound like the holding. The reference to "abandonment" appears to have been just a loose description of the facts. Moreover, the Supreme Court has cited the case often as an example of the "protected areas" theory of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 351 n.8, 88 S.Ct. 507, 511 n.8, 19 L.Ed.2d 576 (1967); *Lopez v. United States*, 373 U.S. 427, 466 n.12, 83 S.Ct. 1381, 1402 n.12, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting); *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct.

---

**1.** Since *Weeks v. United States, supra*, a federal criminal defendant has been permitted to suppress evidence obtained by federal agents in a search or seizure which violated his Fourth Amendment rights. The Supreme Court has explained that this is not a remedy for violation of those rights. "The primary justification for the exclusionary rule then is deterrence of police conduct that violates Fourth Amendment rights. Post-*Mapp* [*Mapp v. Ohio*, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961)] decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). Thus, a defendant does not "abandon" his Fourth Amendment rights because he has no constitutional right to invoke the exclusionary rule. Whatever he may be said to "abandon", it is this ability to invoke the rule which is lost.

Part of the confusion which surrounds "abandonment" lies in the failure to distinguish two possible variations of the theory. First, it could be argued that "abandonment" creates an exception to the exclusionary rule in certain cases in which deterrence is unnecessary or outweighed by other social goals. On the other hand, it could be argued that "abandonment" removes a person's privacy interest from the group of interests protected by the Fourth Amendment. See pp. 1089–1090 *infra*. Most courts have only considered whether the defendant "abandoned his property", without distinguishing these two versions of the idea. For the sake of simplicity, I have retained this language in my discussion of those cases.

679, 682, 5 L.Ed.2d 734 (1961); *Rios v. United States*, 364 U.S. 253, 262 n.6, 80 S.Ct. 1431, 1437 n.6, 4 L.Ed.2d 1688 (1960); *Olmstead v. United States*, 277 U.S. 438, 465, 48 S.Ct. 564, 568, 72 L.Ed. 944 (1928), *overruled on other grounds, Katz v. United States, supra; United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927); *Carroll v. United States*, 267 U.S. 132, 151, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925). *But see Michigan v. Tyler*, 436 U.S. 499, 517, 98 S.Ct. 1942, 1954, 56 L.Ed.2d 486 (1978) (Rehnquist, J., dissenting); *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). Thus, *Hester* is better understood as a product of that discredited theory. *Katz v. United States, supra*, 389 U.S. at 351–52, 88 S.Ct. at 511–512. It cannot support the government's "abandonment" argument here.[2]

Four later Supreme Court cases discuss "abandonment" in the context of the Fourth Amendment.[3] Two of these discuss the topic in factual situations which are different from the present case. *Michigan v. Tyler, supra*, 436 U.S. at 505–06, 98 S.Ct. at 1954 (store lessee did not abandon premises virtually destroyed in serious fire); *Abel v. United States, supra*, 362 U.S. at 240–41, 80 S.Ct. at 697–698 (hotel guest abandoned contents of room when he checked out and left premises). These cases have left trails of "fire" and "tenant checkout" abandonment cases. *E. g., United States v. Callabrass*, 607 F.2d 559 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980); *Coleman v. Maxwell*, 387 F.2d 134 (6th Cir. 1967) (per curiam), *cert. denied*, 393 U.S. 1007, 89 S.Ct. 492, 21 L.Ed.2d 472 (1968). There is also a line of "garbage" abandonment cases, *e. g., Magda v. Benson*, 536 F.2d 111 (6th Cir. 1976) (per curiam), which may be traced indirectly to *Abel. See Abel v. United States, supra*, 362 U.S. at 241, 80 S.Ct. at 698.

Since *Hester*, the Supreme Court has twice faced the issue of "abandonment" in the midst of a person's confrontation with police. *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Rios v. United States, supra.* In both cases, they dismissed the theory in a footnote.

**2.** In contrast with its theory, the Court's result in *Hester* continues to be accepted. *E. g., Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430 n.12, 58 L.Ed.2d 387 (1978); *Air Pollution Variance Board of Colorado v. Western Alfalfa Corp.*, 416 U.S. 861, 865, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974); *Cady v. Dombrowski*, 413 U.S. 433, 450, 93 S.Ct. 2523, 2532, 37 L.Ed.2d 706 (1973). Certainly, its facts appear to fall within at least two exceptions to the general requirement of a search warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 472 n.28, 91 S.Ct. 2022, 2041 n.28, 29 L.Ed.2d 564 (1971); *Ker v. California*, 374 U.S. 23, 40–41, 83 S.Ct. 1623, 1633–1634, 10 L.Ed.2d 726 (1963) [risk that evidence could be destroyed]; *Coolidge v. New Hampshire, supra*, 403 U.S. at 465, 91 S.Ct. at 2037; *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967) [combination of hot pursuit and plain view doctrines]. *Accord, Coolidge v. New Hampshire, supra*, 403 U.S. at 509 n.6, 91 S.Ct. at 2059 n.6 (Black, J., concurring and dissenting); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (per curiam). *Cf. Rakas v. Illinois, supra*, 439 U.S. at 143 n.12, 99 S.Ct. at 430 n.12; *Giddens v. State*, 156 Ga.App. 258, 274 S.E.2d 595, 596–97 (1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1733, 68 L.Ed.2d 220 (1981) [expectation of privacy in open field is unreasonable].

**3.** On several occasions within the past few years, the Court has examined situations in which a defendant's voluntary exposure of his property may have deprived his privacy interest of the protection of the Fourth Amendment. *E. g., Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (defendant placed seized goods in third party's purse); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (defendant left seized goods in mother's apartment); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (defendant placed seized goods in retail store for sale); *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (defendant shot policeman in searched premises). Technically, these cases have not involved "abandonment" because the defendants did not appear to relinquish their proprietary interests in the goods or the premises involved. They simply exposed their property to public scrutiny. Whether or not this is an important distinction, the issue involved in these cases is different from the issue presented by "abandonment" because these defendants' actions were not taken in response to the sudden appearance of police. *But see* note 4 *infra. See generally* pp. 1091–1094 *infra.*

In *Rios*, the defendant was riding in a taxicab. While the cab was stopped for a traffic light, police officers walked up to either side of it. The cab door opened, and the defendant began to get out. He dropped a package to the floor of the cab. One of the officers grabbed the defendant, while the other seized the package. The defendant broke loose and ran down an alley. One of the officers then shot him in the back. On these facts, the Supreme Court firmly rejected the idea that the defendant had "abandoned" the package.

> A passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have "abandoned" it. An occupied taxicab is not to be compared to an open field, *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], or a vacated hotel room, *Abel v. United States*, 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668].

364 U.S. at 262 n.6, 80 S.Ct. at 1437 n.6.

Like the explanation in *Hester*, this language fails to distinguish the concepts of "protected areas" and "abandonment". Both decisions, of course, preceded the Court's rejection of the "protected areas" theory in *Katz v. United States, supra*. Nonetheless, the Court clearly dismissed the argument of "abandonment". *But see Rakas v. Illinois, supra* note 2, 439 U.S. at 149 n.16, 99 S.Ct. at 433 n.16. *Cf. Massachusetts v. Painten*, 389 U.S. 560, 566–67, 88 S.Ct. 660, 663–664, 19 L.Ed.2d 770 (1968) (per curiam) (White, J., dissenting from dismissal of the writ as improvidently granted).

In *Walter*, the defendants were indicted on obscenity charges arising out of the interstate transportation of sexually explicit motion pictures. They challenged the FBI's failure to obtain a search warrant before viewing the films. The government argued that the defendants had "abandoned" the films by failing to demand their return for a period of more than twenty months. The Court ruled, 5–4, that the evidence had to be suppressed. Justice Stevens, who announced the judgment of the Court, rejected the "abandonment" argument on behalf of Justice Stewart and himself:

> Nor can petitioners' failure to make a more prompt claim to the Government for return of the films be fairly regarded as an abandonment of their interest in preserving the privacy of the shipment. As subsequent events have demonstrated, such a request could reasonably be expected to precipitate criminal proceedings. We cannot equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest in the contents of the cartons.

447 U.S. at 658 n.11, 100 S.Ct. at 2402 n.11. Justice Blackmun, writing for the four dissenting justices, accepted the "abandonment" theory without explanation. 447 U.S. at 665, 100 S.Ct. at 2405. The other three justices, White, Brennan and Marshall, did not comment on it, but must have rejected it in order to vote as they did.

These cases establish that a defendant may not suppress evidence obtained in a search or seizure of property which he has "abandoned". Unfortunately, they do not explain the theory or standards which determine if "abandonment" has occurred. *See* note 1 *supra*. *Hester* stressed "open fields". *Abel* emphasized that the defendant had returned the "exclusive right to possession" to the hotel manager, who had consented to the search. *Rios* noted only that neither fields nor vacant hotel rooms were present. *Tyler* pointed out that fire victims retain "protectible expectations of privacy" in the remains of their property. *Walter* refused to equate abandonment with "unwillingness to invite prosecution" in an opinion in which only two justices joined. Can a person ever "abandon" his property under the pressure of unexpected confrontation with police? *Hester, Abel, Rios, Tyler* and *Walter* provide little guidance on this issue.

Despite the absence of clear Supreme Court precedent,[4] at least eight U.S. Courts

---

4. Two Supreme Court decisions provide limited support for the idea of "abandonment" in po-

lice-citizen confrontations. *Rawlings v. Kentucky, supra* note 3, 448 U.S. at 101 n.1, 100

of Appeals have denied motions to suppress because the defendant "abandoned" his property by making statements or taking actions in response to the unexpected presence of police.[5] *United States v. Canady,* 615 F.2d 694 (5th Cir.), *cert. denied,* 449 U.S 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *United States v. Miller,* 589 F.2d 1117 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *Lurie v. Oberhauser,* 431 F.2d 330 (9th Cir. 1970); *United States v. Martin,* 386 F.2d 213 (3d Cir. 1967) (per curiam), *cert. denied,* 393 U.S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968); *Vincent v. United States,* 337 F.2d 891 (8th Cir. 1964), *cert. denied,* 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281 (1965); *United States v. Zimple,* 318 F.2d 676 (7th Cir.), *cert. denied,* 375 U.S. 868, 84 S.Ct. 128, 11 L.Ed.2d 95 (1963); *Jackson v. United States,* 301 F.2d 515 (D.C.Cir.) (per curiam), *cert. denied,* 369 U.S. 859, 82 S.Ct. 947, 8 L.Ed.2d 17 (1962); *Trujillo v. United States,* 294 F.2d 583 (10th Cir. 1961). Surprisingly, there has been almost no analysis of this result. With one exception, these cases all precede *Walter.*[6] None even mentions the Supreme Court's comment in *Rios.* Only the U.S. Court of Appeals for the Fifth Circuit has reaffirmed its position in several cases over the past decade. *E. g., United States v. Berd, supra* note 6; *United States v. Canady, supra; United States v. Anderson,* 500 F.2d 1311 (5th Cir. 1974); *United States v. Maryland,* 479 F.2d 566 (5th Cir. 1973) (per curiam); *United States v. Colbert,* 474 F.2d 174 (5th Cir. 1973); *United States v. Edwards,* 441 F.2d 749 (5th Cir.

1971). The other courts have simply denied a suppression motion once or twice over the past twenty years because the defendant "abandoned" his property. Usually, this has been accompanied by just a quick citation to one or more of the cases listed above.

With all due respect, I believe that this issue deserves more intensive scrutiny than it has received. *See* note 13 *infra.* No Court of Appeals precedent in the Sixth Circuit controls my consideration of the question. In fact, two other judges of this District have limited the "abandonment" theory in cases similar to the present one. *United States v. Coleman,* 450 F.Supp. 433, 436–37 (E.D.Mich.1978) (Pratt, J.); *United States v. Chamblis,* 425 F.Supp. 1330, 1335 (E.D.Mich.1977) (Churchill, J.) ("abandonment" ineffective if preceded by unconstitutional investigatory stop).

*United States v. Colbert, supra,* is the only thorough analysis of "abandonment" in a confrontation with police. The trial judge admitted the evidence, but a Fifth Circuit panel reversed. Upon rehearing en banc, the full court voted 15–1 to reverse the panel, and affirm the trial court.

The District Court found the following facts. The defendants were walking down a street in Birmingham, Alabama, carrying briefcases. Two local police officers saw them, and recognized one of them. As the officers approached, the defendants set the briefcases down on the sidewalk. When the officers questioned them, they claimed to be book salesmen. The officers then asked to

S.Ct. at 2556 n.1; *Abel v. United States, supra,* 362 U.S. at 222–25, 80 S.Ct. at 688–690. In *Rawlings,* the defendant may or may not have known that the police were outside when he placed his drugs in his friend's purse. In *Abel,* the presence of INS officers clearly influenced the defendant to leave behind evidence of his espionage when he checked out of his hotel room. In both cases, the Court ruled that the evidence was admissible. In neither case, however, did they consider the possible significance of police presence. Moreover, the officer in *Abel* obtained the consent of the hotel manager before he searched the room, a recognized alternative to a magistrate's warrant. *Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946), *vacated on other*

grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947) (per curiam).

**5.** The U.S. Court of Appeals for the Sixth Circuit has not addressed this issue in the context of such confrontations. The U.S. Court of Appeals for the Second Circuit has avoided it. *United States v. Callabrass, supra,* at 565–66 (Oakes, J., dissenting).

**6.** *United States v. Berd,* 634 F.2d 979 (5th Cir. 1981). The U.S. Court of Appeals for the Fifth Circuit recently has limited the application of the "abandonment" theory in light of *Rakas v. Illinois, supra* note 2. *United States v. Richards,* 638 F.2d 765, 770 (5th Cir. 1981).

see their "wares". At this, the defendants argued that they did not have to show anything to police, claimed that they did not own the briefcases or know anything about them, and started to walk away. The officers stopped them again and asked to see their draft cards. When they denied having draft cards, they were arrested. Once they were seated in the patrol car, the police opened the briefcases and discovered illegal, sawed-off shotguns.

Judge Thornberry explained the majority's reasoning:

> [I]t is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned...
>
> Abandonment is primarily a question of intent.... Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. [Citations omitted.] The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. [Citations omitted.]
>
> The facts of this case show conclusively that [the defendants] abandoned their briefcases before the searches took place.

474 F.2d at 176.

Judge Goldberg, author of the original panel opinion, dissented vigorously. He accepted the general principle which the majority claimed to follow. "It is true, as Judge Thornberry states, that 'one has no standing to complain of a search or seizure of property he has voluntarily abandoned.'" 474 F.2d at 180. He insisted, however, that the Court's application of the principle of "voluntary abandonment" to the facts of the case was the "funeral of the Fourth Amendment" in the Fifth Circuit. 474 F.2d at 179. His dissent merits fuller quotation.

> Allowing the statements of alleged disclaimer made under the duress of apprehension and the fear of inevitable discovery to constitute a waiver of constitutional rights is unprecedented. While abandonment may not require an instrument under seal or a notarial act, it should not be extracted from *res gestae* words, uttered in fear and without knowledge of legal effect. Abandonment must have some aspect of meaningful voluntariness, which is not, I think, generally found in the confines of a squad car during a period of custodial questioning.
>
> ... [T]he officers knew full well that the briefcases belonged to Colbert and Reese....
>
> .     .     .     .     .
>
> ... What the majority calls a "voluntary abandonment" I would call simply a patently, unbelievable *lie* [emphasis in original] uttered in desperation.
>
> .     .     .     .     .
>
> A coerced lie cannot effect an abandonment. No one, but no one, could have believed that defendants were not in possession of the briefcases. To say that defendants knew they were waiving a constitutional right when they uttered these meaningless lies under the threat of imminent discovery is a fiction, pure and simple.... Neither the police officers, the defendants, nor anyone on the streets of Birmingham that day could possibly have believed that anything was "abandoned", voluntarily or otherwise, as a result of defendants' lie.

474 F.2d at 181–83.

These comments are the most elaborate judicial formulations of a theory of "abandonment" in police-citizen confrontations. Judges Thornberry and Goldberg agreed that a defendant can "abandon" his property. They agreed that "abandonment" is to be found by reference, primarily if not exclusively, to the defendant's intent. From this point, however, their theories diverge.

Judge Thornberry stated that "abandonment" should be found whenever the defendant "relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of

privacy with regard to it." 474 F.2d at 176. He cited *Katz v. United States, supra,* as the primary authority for his theory.

Judge Goldberg's analysis is quite different. He described "abandonment" as a constitutional waiver. 474 F.2d at 183. Thus, the intent which he found crucial was the intent to abandon one's constitutional right to insist that a government search occur only upon a magistrate's finding of probable cause. The obvious source of this analysis is *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The fervor of his dissent may be explained largely by the absence of any evidence that the defendants had such an intent.

In *Michigan v. Tyler, supra,* the Supreme Court implicitly endorsed Judge Thornberry's analysis. In *Tyler,* the Court held that a furniture store lessee could object to evidence of arson which police and fire officials found in his store after it was destroyed by fire. They said:

> The petitioner argues . . . that an entry to investigate the cause of a recent fire is outside that protection [of the Fourth Amendment] because no individual privacy interests are threatened. If the occupant of the premises set the blaze, . . . his "actions show that he has no expectation of privacy" because "he has abandoned those premises." . . . And if the fire had other causes, "the occupants of the premises are treated as victims." . . .

This argument is not persuasive. For even if the petitioner's contention that arson establishes abandonment be accepted, its second proposition—that innocent fire victims inevitably have no protectible expectations of privacy in whatever remains of their property—is contrary to common experience. . . . [I]t is, of course, impossible to justify a warrantless search on the ground of abandonment by arson when that arson has not yet been proved.

436 U.S. at 505–06, 98 S.Ct. at 1947–1948. Although this language is not entirely clear, I believe that it states two propositions. First, innocent fire victims do not "abandon" their property, because they retain reasonable expectations of privacy in it. Second, whether or not arson constitutes "abandonment" because it makes those expectations unreasonable, arson has not been proved at the time of the search. *Accord, Mincey v. Arizona, supra* note 3, 437 U.S. at 391, 98 S.Ct. at 2412.

■ Of course, "abandonment" after a fire is different from "abandonment" during a confrontation with police. Nonetheless, nothing in *Tyler* limits the Court's approach to cases of fire or flood. I conclude that "abandonment" in police confrontations, as in fires, must be measured by reasonable expectations of privacy.[7] *Accord, Walter v. United States, supra,* 447 U.S. at 658 n.11, 100 S.Ct. at 2402 n.11; *United States v. Canady, supra,* at 696–97; *Magda v. Benson, supra,* at 112–13; *United States v. Wilson,* 472 F.2d 901, 902–03 (9th Cir. 1972), *cert. denied,* 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973).

Unfortunately, the use of "reasonable expectations of privacy" to define "abandonment" does not clarify its theoretical justification. As I have noted, *see* note 1 *supra,* an "abandonment" could be words or actions which make application of the exclusionary rule undesirable, because deterrence of police conduct is unnecessary or outweighed by other considerations. On the other hand, it could be words or actions which remove the protection of the Fourth Amendment from a person's privacy interest. The Supreme Court has never explained its proper rationale. Similarly, they have never firmly decided whether "reasonable expectation of privacy" is a limitation of the substantive scope of the Fourth Amendment, or just a judicial limitation of

---

**7.** The Court has also used this standard in "voluntary exposure" cases. *See* cases cited note 3 *supra.* The analysis pressed by Judge Goldberg is still used to define waivers of Sixth and Seventh Amendment rights. *See Schneck-* *loth v. Bustamonte,* 412 U.S. 218, 237–40, 93 S.Ct. 2041, 2052–2055, 36 L.Ed.2d 854 (1973). After *Stone v. Powell, supra* note 1, 428 U.S. at 486, 96 S.Ct. at 3048 it is untenable in Fourth Amendment suppression motions.

the exclusionary rule.[8] Usually they have used this standard to define the type of privacy interest which the Fourth Amendment protects. *E. g., Rakas v. Illinois, supra* note 2, 439 U.S. at 143, n.12, 99 S.Ct. at 430, n.12 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."). *Accord, Steagald v. United States,* —— U.S. ——, ——, n.5, 101 S.Ct. 1642, 1646 n.5, 68 L.Ed.2d 38 (1981); *Smith v. Maryland,* 442 U.S. 735, 743–45, 99 S.Ct. 2577, 2581–2583, 61 L.Ed.2d 220 (1979). In some cases, however, the deterrent goal of the exclusionary rule has guided its evolution.[9] *E. g., United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) ("This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.") *Accord, Stone v. Powell, supra* note 1, 428 U.S. at 485–89, 96 S.Ct. at 3048–3050.

A "reasonable expectation of privacy" cannot meaningfully be used to define both the limits of the Fourth Amendment and the proper scope of the rule. If this phrase defines the reach of the Fourth Amend-

ment, it measures the "scope of privacy that a free people legitimately may expect." *Rakas v. Illinois, supra* note 2, 439 U.S. at 151, 99 S.Ct. at 434 (Powell, J., concurring). Considerations of the exclusionary rule are irrelevant to such an inquiry. It would be senseless to define the proper limits of protected privacy by the efficacy of the exclusionary rule as an enforcement of those limits.[10] On the other hand, if a "reasonable expectation of privacy" defines the proper scope of the exclusionary rule, the "analysis of [the rule's] usefulness in a particular context", *Stone v. Powell, supra* note 1, 428 U.S. at 488, 96 S.Ct. at 3049, is only confused by inquiries into the history and goals of the Fourth Amendment.

In this case, I am not forced to choose between these explanations. *See* note 11 *infra. Michigan v. Tyler, supra,* analyzed "abandonment" in terms of "reasonable expectations of privacy". Whether this standard is a limitation of the Fourth Amendment or of the exclusionary rule, it simply does not support the government's theory of "abandonment" in police-citizen confrontations.

■ In his concurring opinion in *Katz v. United States, supra,* Justice Harlan distinguished two components of "reasonable expectation of privacy":

My understanding of the rule that has emerged from prior decisions is that there

---

8. The Supreme Court has never been forced to choose between these two explanations. For instance, they have never needed to consider whether a reasonable expectation of privacy must be proved in an action for damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), or under 42 U.S.C. § 1983, *see Doe v. Renfrow,* —— U.S. ——, ——, 101 S.Ct. 3015, 3016, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from denial of petition for writ of certiorari).

9. This ambiguity is also found in the Court's requirements for a valid consent search. In *Zap v. United States, supra* note 4, 328 U.S. at 628, 66 S.Ct. at 1279, the Court held that a defendant "voluntarily waived" his Fourth Amendment privacy when he "specifically agreed" to inspection of his business records. In *Schneckloth v. Bustamonte, supra* note 7, 412 U.S. at 228–29, 93 S.Ct. at 2048–2049, the

Court held that a defendant's consent is valid if it appears from the totality of the circumstances that it was voluntary, rather than coerced. *Zap* emphasized waiver of constitutional rights. *Schneckloth* appears to have been influenced by the desire to limit the exclusionary rule to cases in which deterrence of the police is necessary. *See* p. 1093 *infra.*

10. Considerations of the exclusionary rule often cloud Fourth Amendment analysis. Judges who are eager to deter certain police practices expand the scope of the Amendment in order to exclude evidence discovered through those practices. On the other hand, other judges who question the value of the exclusionary rule narrow the scope of the Amendment in order to avoid the rule. Neither analysis is proper. The presence or absence of a Fourth Amendment violation has nothing to do with the exclusionary rule.

is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable". 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Later, a majority of the Court accepted Harlan's analysis. *Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2580. *Accord, United States v. Bailey,* 628 F.2d 938, 940–41 (6th Cir. 1980). Thus, a defendant "abandons" his property only if he fails to meet one of these requirements.

A. *Subjective Expectation of Privacy*

█ At least since *Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2580, a defendant may object to the introduction of evidence discovered in a search only if he can demonstrate a subjective expectation of privacy "in the area searched". *United States v. Salvucci, supra* note 3, 448 U.S. at 93, 100 S.Ct. at 2553. This expectation must appear from the totality of the circumstances, *Rawlings v. Kentucky, supra* note 3, 448 U.S. at 104, 100 S.Ct. at 2561, but it is not clear when it must exist, *Walter v. United States, supra,* 447 U.S. at 658 n.12 & 665, 100 S.Ct. at 2402 n.12 & 2406.

If a defendant always needed a subjective expectation of privacy at the time of the search, an "abandonment" defendant's suppression motion would almost always fail. In the typical police confrontation "abandonment" case, the defendant disowns his package precisely because he believes its contents are about to be revealed. At the time he denies ownership, he clearly lacks an expectation of continued privacy.

The Court has not applied this subjective expectation requirement with this degree of literal precision. They have acknowledged that a subjective expectation may not always be required:

Situations can be imagined, of course, in which *Katz'* two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

*Smith v. Maryland, supra,* 442 U.S. at 740 n.5, 99 S.Ct. 2580 n.5. In fact, they have ignored subjective expectations entirely in several cases, without explanation. *E. g., Michigan v. Tyler, supra,* 436 U.S. at 505–06, 98 S.Ct. at 1947–1948; *Nixon v. Administrator of General Services,* 433 U.S. 425, 457–58, 97 S.Ct. 2777, 2797–2798, 53 L.Ed.2d 745 (1977); *Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968).

█ Defendant checked her locked luggage with the airline for her flight to Detroit. The luggage was properly marked with a claim number, and defendant retained the stub. She obviously expected its contents to remain private until the government agents confronted her. Under either interpretation of the "reasonable expectation of privacy" standard, I do not find any later change in her actual expectation relevant.

If "reasonable expectations of privacy" define the range of protected Fourth Amendment interests,[11] there is no reason

11. The Court has never explained why the protection of the Fourth Amendment should *ever*

depend upon actual expectations, or how the requirement of such expectations can be "for-

to exclude her interest from the protection of the Amendment because she lost her actual expectation of privacy when the police approached. The coverage of the Fourth Amendment does not expand or contract to match a person's expectations about police behavior. *Smith v. Maryland, supra,* 442 U.S. at 740 n.5, 99 S.Ct. at 2580 n.5, quoted above. Certainly, no one would contend that police may conduct a night-time raid without probable cause if the frightened homeowner has anticipated that it will occur. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds, Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also Walter v. United States, supra,* 447 U.S. at 658 n.12, 100 S.Ct. at 2402 n.12.

Similarly, if "reasonable expectations of privacy" define the proper scope of the exclusionary rule,[12] the loss of her expectation should not affect the availability of the rule. In *Stone v. Powell, supra* note 1, 428 U.S. at 486–89, 96 S.Ct. at 3048–3050, the Supreme Court explained that the rule should be applied only when the value of deterring Fourth Amendment violations outweighs the value of admitting reliable, probative evidence in a criminal trial. An actual expectation of privacy is one of the elements which has been considered necessary to tip this balance in favor of exclusion. *See* the "voluntary exposure" cases cited note 3 *supra.*

In an "abandonment" case, the defendant takes "normal precautions to maintain his privacy", *Rawlings v. Kentucky, supra* note 3, 448 U.S. at 105, 100 S.Ct. at 2561 and

demonstrates a subjective expectation of privacy until the police arrive. After police confront him, his actual expectation of privacy is influenced heavily by his personal reaction to their presence. He may or may not expect his privacy to be jeopardized, depending upon his attitudes about police and his knowledge of Fourth Amendment law. Society's interest in the admission of incriminating evidence is no greater when the defendant's personal reaction to police includes loss of his expectation of privacy than it is in other cases. In fact, the need for deterrence may even be greater if the defendant has openly revealed his cynical expectations about police behavior.[13]

### B. Legitimacy/Reasonableness of Expectation

■ If the government's theory of "abandonment" were to be followed here, it would be because defendant's disclaimer somehow deprived her of her "right"[14] to suppress the evidence. However this result is explained, it is difficult to reconcile with the language of the "legitimacy" or "reasonableness" requirement. *Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2580 ("The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as 'reasonable', . . . whether . . . the individual's expectation, viewed objectively, is 'justifiable' under the circumstances."). *Accord, Rakas v. Illinois, supra* note 2, 439 U.S. at 143 n.12, 99 S.Ct. at 430 n.12. By definition, the defendant in an "abandonment" case loses his expectation of privacy

---

given" in certain cases. Perhaps the first prong of Justice Harlan's test is a limit of the exclusionary rule, while the second measures the coverage of the Amendment itself.

**12.** This interpretation of the "reasonable expectation of privacy" standard requires one to assume that the search violates the defendant's Fourth Amendment rights. Otherwise, there is no unconstitutional police conduct to be deterred. The Court has not always made this assumption clear. *Compare Rakas v. Illinois, supra* note 2, 439 U.S. at 134, 99 S.Ct. at 425 (reasonable expectation of privacy as limit of Fourth Amendment) *with United States v. Ca-*

*landra, supra,* 414 U.S. at 348, 94 S.Ct. at 620 ("standing" as limit of exclusionary rule).

**13.** This application of the subjective expectation requirement does not undermine the results reached in most of the fire, garbage, and tenant-checkout abandonment cases. *See* cases cited pp. 1085–1086 *supra.* In most of these cases, the defendant lost interest in maintaining his privacy independent of pressure from the presence of police. *Contra, Abel v. United States, supra,* 362 U.S. at 222–25, 80 S.Ct. at 688–690. *See generally* note 3 *supra.*

**14.** *See* note 1 *supra.*

when the police confront him. Thus, the legitimacy of *his* expectation can only be evaluated before the confrontation, when an expectation actually exists.

In this case, as in most other "abandonment" cases, defendant's expectation of privacy before the agents confronted her was legitimate. Her luggage was locked, and properly identified with a claim number. It was transported by the airline without being opened, as part of the normal course of its business. Certainly, her expectation was "recognized and permitted by society", *Rakas v. Illinois, supra* note 2, at 143 n.12, 99 S.Ct. at 431 n.12, even if her appearance and travel arrangements fit DEA's "drug courier profile".

■ Of course, the usual explanation of "abandonment" is that the defendant's disclaimer destroys the legitimacy of his privacy interest. *E. g., United States v. Berd, supra* note 6, at 987; *United States v. Miller, supra,* at 1131. For instance, in *United States v. Canady, supra,* at 697, the court said:

> In the instant case, Canady disclaimed ownership of the suitcase, first to Officer LeStage at the first checkpoint, again to Officer Short at the second checkpoint, then to Officer Mangrum as Canady and Mangrum walked back to the second checkpoint, again to Officer Mangrum after the suitcase had been searched, and finally to Agent Markonni.
>
> We hold here, as in *Colbert* [*United States v. Colbert,* 474 F.2d 174 (5th Cir. 1973)] and *Anderson* [*United States v. Anderson,* 500 F.2d 1311 (5th Cir. 1974)], that Canady abandoned the suitcase, and, applying the *Rakas* [*Rakas v. Illinois,* 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387] (1978)] analysis, we hold that Canady had no legitimate expectation of privacy in the suitcase or its contents. He had no expectation of privacy deriving from a property interest or from any understanding "recognized and permitted by society," 439 U.S. at 144, n. 12, 99 S.Ct. at 431 [n.12], because he had abandoned the suitcase.

The emphasis is upon a point in time at which the defendant had no expectation of privacy. Thus, the issue in "abandonment" is not whether the defendant's *actual* expectation is reasonable after he disowns the property. Rather, it is whether the lie deprives his privacy interest of the protection of the Fourth Amendment, *see Rakas v. Illinois, supra* note 2, at 151, 99 S.Ct. at 434 (Powell, J., concurring), or creates competing social needs which outweigh the deterrence value of the exclusionary rule, *Stone v. Powell, supra* note 1, 428 U.S. at 486–89, 96 S.Ct. at 3048–3050. I find that it does not.

First, if the "reasonable expectation of privacy" standard is a limit of the substantive scope of the Fourth Amendment, the disclaimer does not remove defendant's privacy interest from the group of "legitimate" or "reasonable" privacy interests protected by the Amendment. She still owns the luggage, and still has an interest in the privacy of her "papers, and effects." U.S.Const. amend. IV. Society's interest in the protection of her personal privacy remains as strong after the disclaimer as before it.

At least in police confrontations, "abandonment" is really a doctrine of forfeiture or estoppel. A person realizes that his property is about to be searched, panics, and desperately tries to disown it. By the disclaimer, he is hopelessly trying to preserve his privacy. Of course, the lie is ignored, and the search proceeds. Yet, because of an absurd, pathetic statement which no one believes, he forfeits constitutional protection of his privacy. I find no precedent for attaching such a penalty to lying to the police.

Second, if the standard is really a limitation of the exclusionary rule,[15] defendant's "abandonment" has not created the need for an exception to the rule. In *Schneckloth v. Bustamonte, supra* note 7, the Supreme Court recognized that deterrence of police misconduct plays no role in situations in which the police have relied in good faith

---

**15.** *See* note 12 *supra.*

upon a consent which appeared to be knowing and voluntary. Therefore, they refused to apply the exclusionary rule in "voluntary consent" cases.

No good faith reliance is present in a case of so-called "voluntary abandonment". The police do not rely on the disclaimer. On the contrary, the search proceeds upon the assumption that the defendant is lying. The dynamics of the situation do not change. Whether or not the exclusionary rule actually serves its purpose, the need for deterrence of police misconduct remains.

In fact, "abandonment" actually presents a relatively appealing case for application of the rule. It is not a situation in which "the criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 150 N.E. 585, 587 (1926) (Cardozo, J.). The "abandonment" theory enables police intentionally to circumvent the privacy protections of the Fourth Amendment.[16] They may approach a "suspicious" person and try to pressure him into "abandoning" his property. If they fail to coerce "abandonment", their actions are never scrutinized by a magistrate. If they succeed, they are free to search the "abandoned" property, and seize whatever they find. They have no warrant. They have no probable cause to believe that they will discover evidence of a particular crime. They simply go fishing. Their conduct is reviewed only when they catch something. The exclusionary rule was created specifically to deter this kind of systematic violation. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, supra note 8, 403 U.S. at 413, 91 S.Ct. at 2013 (Burger, C. J., dissenting).

*Conclusion*

Defendant's luggage was searched without probable cause to believe that it contained evidence of a particular crime. *See Carroll v. United States, supra*, 267 U.S. at 159–162, 45 S.Ct. at 287–288. Moreover,

the search was conducted without a search warrant, and without exigent circumstances which would justify its absence. *See Arkansas v. Sanders, supra*, 442 U.S. at 762–64, 99 S.Ct. at 2589–2592. Such evidence is inadmissible. *Weeks v. United States, supra*, 232 U.S. at 398, 34 S.Ct. at 346. Defendant's doomed attempt to mislead the agents and prevent the search does not change these rules. Her motion is granted.

---

16. I do not mean to suggest that Special Agent Bryda acted in bad faith. Before today, he could only have concluded that he did not need probable cause or a warrant to search defendant's luggage. The police response to an "abandonment" is intentional and systematic in the sense that it is a conscious, deliberate course of conduct. As such, it is more easily deterred than inadvertent blunders.