PEOPLE v GRAINGER

Docket No. 51885. Submitted December 3, 1981, at Detroit.—Decided July 13, 1982.

Peter G. Grainger was convicted in Wayne Circuit Court, Patrick J. Duggan, J., of carrying a concealed weapon. The charge arose out of the attempt by defendant to board a commercial airplane under an assumed name with a handgun concealed in the briefcase he was carrying. When airline officials became suspicious, defendant was asked to accompany them to an x-ray machine for a scan of the briefcase. The scan revealed the outline of a gun and a police officer was summoned. The officer instructed defendant to open the locked briefcase. Defendant refused, stating that the briefcase belonged to a friend. The briefcase was again x-rayed, defendant was arrested, and the briefcase was opened, revealing a loaded handgun, identification in defendant's true name, and a concealed weapon permit issued to defendant. Defendant moved to suppress both the gun as the product of an illegal search and seizure and his statement disclaiming ownership of the briefcase because of the failure to inform him of his constitutional rights prior to questioning him. The prosecution argued that defendant lacked standing to raise the search and seizure issue and that the defendant's statement was voluntary rather than the product

REFERENCES FOR POINTS IN HEADNOTES
[1] 4 Am Jur 2d, Appeal and Error §§ 76, 166.
Application of "clearly erroneous" test of Rule 52(a) of Federal Rules of Civil Procedure to trial court's findings of fact based on documentary evidence. 11 ALR Fed 212.
[2] 68 Am Jur 2d, Searches and Seizures § 59.
[3, 14] 68 Am Jur 2d, Searches and Seizures §§ 8, 84.
[4, 16] 68 Am Jur 2d, Searches and Seizures § 9.
[5-8, 17] 21A Am Jur 2d, Criminal Law §§ 793-795.
[9, 10] 79 Am Jur 2d, Weapons and Firearms § 14.
[10] 46 Am Jur 2d, Judgments §§ 524-528.
Modern status of doctrine of res judicata in criminal cases. 9 ALR3d 203.
[11] 75 Am Jur 2d, Trial § 625.
[12, 13] 68 Am Jur 2d, Searches and Seizures § 46.
[15] 29 Am Jur 2d, Evidence § 425.

of any interrogation. The trial court denied both motions to suppress. The trial court submitted the charge of carrying a concealed weapon to the jury on two different theories: (1) that defendant's concealed weapon permit was not valid on the date of his possession, or (2) that the carrying of the weapon on the airplane flight was outside the scope of the permitted uses encompassed by the permit. Defendant appeals. *Held:*

1. While an x-ray scan of luggage at an airport is a search within the meaning of the constitutional provisions concerning searches and seizures, defendant lacked standing to raise the search and seizure question because his disclaimer of ownership of the briefcase amounted to abandonment of any right of privacy he might have in such property.

2. Defendant's statement disclaiming ownership of the briefcase was a voluntary statement rather than the product of an interrogation and thus did not have to be suppressed even though, at the time it was made, defendant had not been informed of his right to remain silent.

3. It was error to submit to the jury the question of whether defendant's concealed weapons permit was in force on the day in question. The determination of the Oakland Circuit Court in a suit against the Oakland licensing board that the license was in force on the day in question is binding on the Wayne County Prosecutor. Since it is impossible to determine whether the jury relied upon this theory or on the alternative theory presented at trial in reaching its verdict, reversal of defendant's conviction is mandated.

Reversed and remanded.

BRONSON, J., concurred that reversal is mandated. He, however, would hold that both the gun and defendant's statement of disclaimer should have been suppressed since they were obtained in violation of defendant's constitutional rights.

### OPINION OF THE COURT

1. APPEAL — CRIMINAL LAW — EVIDENCE — MOTION TO SUPPRESS.

   The Court of Appeals will not reverse a trial court's ruling on a motion to suppress evidence unless that ruling is found to be clearly erroneous.

2. SEARCHES AND SEIZURES — AIRPORTS — X-RAY SCANS — CONSTITUTIONAL LAW.

   An x-ray scan of luggage at an airport is a search within the requirement of the Fourth Amendment since the x-ray scan system is part of a screening system required by the federal government.

3. SEARCHES AND SEIZURES — STANDING.

The proper test for determining whether a defendant has standing to dispute a search and seizure is whether he has a legitimate expectation of privacy in the area searched.

4. SEARCHES AND SEIZURES — ABANDONED PROPERTY.

A disclaimer of ownership of property constitutes abandonment of the property; a person does not have, for search and seizure purposes, a legitimate expectation of privacy in abandoned or unclaimed property.

5. CRIMINAL LAW — POST-CUSTODY STATEMENTS — VOLUNTARY STATEMENTS — CONSTITUTIONAL LAW — MIRANDA WARNINGS.

Not all statements obtained by police after a person has been taken into custody should be considered products of interrogation, and volunteered statements of any kind are not barred by the Fifth or Fourteenth Amendments; interrogation which would trigger the necessity of giving a defendant *Miranda* warnings should reflect a measure of compulsion above and beyond that inherent in the custody itself.

6. CRIMINAL LAW — MIRANDA WARNINGS — INTERROGATIONS OF SUSPECTS IN CUSTODY.

*Miranda* safeguards should be observed whenever a person in custody is subjected to express questioning by the police or to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.

7. CRIMINAL LAW — MIRANDA WARNINGS — PROTECTION OF SUSPECTS IN CUSTODY — UNFORESEEN RESULTS OF POLICE ACTIONS.

*Miranda* safeguards vest a suspect in custody with an added measure of protection against coercive police practices without regard to objective proof of underlying police intent, but police should not be held accountable for the unforeseeable results of words or actions which they should not have known would be likely to elicit an incriminating response.

8. CRIMINAL LAW — VOLUNTARY STATEMENTS — CONSTITUTIONAL LAW.

A response by an individual that he did not own a piece of luggage after being asked by a police officer at a luggage check point in an airport to open that piece of luggage is a voluntary statement which may be admitted into evidence even though the individual had not been informed of his *Miranda* rights prior to being questioned.

9. CRIMINAL LAW — JURY QUESTIONS — CONCEALED WEAPONS PERMITS — COURTS.

It is error to submit to a jury the question of the validity of a concealed weapons permit on a certain date for the purpose of a criminal charge of carrying a concealed weapon where, in a separate licensing proceeding, a circuit court had determined that the permit was in effect on the date of the possession of the concealed weapon giving rise to the criminal charge.

10. JUDGMENTS — COLLATERAL ESTOPPEL — PROSECUTING ATTORNEYS.

The prosecuting attorney of one county, for the purpose of a criminal prosecution, is precluded by the operation of the doctrine of collateral estoppel from relitigating the validity of a concealed weapons permit where the question of the validity of such permit has been determined in an action against the licensing board of another county which issued the permit; the prosecuting attorney and the licensing board both being creatures of the same sovereign, the State of Michigan, the parties in the two actions are sufficiently identical to permit the application of the doctrine of collateral estoppel.

11. CRIMINAL LAW — JURY INSTRUCTIONS — ALTERNATIVE THEORIES OF GUILT.

Reversal of a criminal conviction is mandated where two theories of guilt are presented to the jury and one of those theories is legally insufficient to support a conviction and it is impossible to tell upon which theory the jury relied.

CONCURRENCE BY BRONSON, J.

12. SEARCHES AND SEIZURES — CONSENT — BURDEN OF PROOF.

*The prosecution has the burden of proving that, under the totality of the circumstances, consent to a search was freely and voluntarily given.*

13. SEARCHES AND SEIZURES — CONSENT — ACQUIESCENCE.

*A showing of acquiescence by a person to a claim of lawful authority to conduct a search is insufficient to establish consent by such individual to a search.*

14. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW — STANDING.

*The State of Michigan has traditionally afforded the citizenry greater protections against unreasonable searches and seizures than have been afforded by the United States Supreme Court; automatic standing to raise a search and seizure issue remains available under the Michigan Constitution despite the retreat*

*from automatic standing by the United States Supreme Court
(Const 1963, art 1, § 11).*

15. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW — SUPPRESSION
OF EVIDENCE.

*In the absence of a federal mandate to suppress as evidence a
firearm seized outside the curtilage of a dwelling house, a
firearm so seized, even if the product of an unlawful search and
seizure, may not be suppressed as evidence since the Michigan
Constitution specifically provides that such evidence seized
under such circumstance shall not be barred from evidence
(Const 1963, art 1, § 11).*

16. SEARCHES AND SEIZURES — ABANDONED PROPERTY — DISCLAIMER
OF OWNERSHIP.

*A disclaimer of ownership of property under circumstances where
a claim of ownership could reasonably lead to criminal liability
does not constitute abandonment of the property or any right
of privacy in the property so as to defeat a claim of an illegal
search and seizure of the property.*

17. CRIMINAL LAW — VOLUNTARY STATEMENTS.

*A statement by a defendant disclaiming ownership of a briefcase
in response to a police request to open the briefcase where a
claim of ownership would reasonably lead to criminal charges
and under circumstances in which the defendant was in cus-
tody is a statement elicited as the result of interrogation and is
not a voluntary statement subject to the requirement that a
defendant be given his Miranda warnings prior to interroga-
tion.*

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Prin-
cipal Attorney, Appeals, and *Andrea L. Solak,*
Assistant Prosecuting Attorney, for the people.

*Nora J. Pasman,* Assistant State Appellate De-
fender, for defendant on appeal.

Before: DANHOF, C.J., and J. H. GILLIS and BRON-
SON, JJ.

PER CURIAM. Defendant was convicted of carry-

ing a concealed weapon contrary to MCL 750.227;
MSA 28.424, at a jury trial held October 6 to 12,
1978, in Wayne County Circuit Court. He was
sentenced on November 13, 1978, to two years
probation. Defendant appeals by right upon denial
of his motion for a new trial.

On April 4, 1978, at approximately 10 p.m.,
defendant approached the ticket counter of Delta
Airlines at Detroit Metropolitan airport. Defen-
dant informed the customer service agent that he
had a reservation in the name of David Sims. The
agent obtained defendant's ticket, a one-way ticket
to Miami, Florida. Defendant paid for the ticket
with cash. It was close to boarding time.

While at the ticket counter defendant checked a
briefcase which had a warning sticker. The agent
asked defendant if the sticker was a restricted
article sticker which had to be cleared through air
freight, but the defendant replied it was not. The
agent read the sticker which stated, "These prem-
ises protected by automatic alarm system from
Northern Electric". The agent then alerted her
supervisor, Bob Tolstyka, that the defendant fit
the FAA hijacker profile. Mr. Tolstyka explained
to defendant that he fell within the guidelines of
federal regulations and that it was required that
he check defendant's identity. Defendant could not
produce any identification. Mr. Tolstyka then told
the defendant that his briefcase would have to be
searched. Since the briefcase was small Mr. Tolst-
yka said it could be put through the x-ray machine
at the security checkpoint.

The defendant did not respond in any way but
accompanied Mr. Tolstyka to the security check-
point where Linda Duchesne, a Pinkerton security
agent, was operating the machine. The briefcase
was passed through the machine. The machine

indicated the outline of what appeared to be a gun. Ms. Duchesne pulled the bag out of the machine and went to open it. However, defendant said that it was locked and that he would open it for her. Ms. Duchesne called a police officer over and told him there was a gun in the briefcase. The officer instructed defendant to open the briefcase, and the defendant refused, stating the briefcase was not his but belonged to a friend. Defendant refused to identify himself or the friend to whom the briefcase belonged. The officer x-rayed the bag and saw an outline of a gun. He called the security office and was told to bring the defendant and the briefcase to the office. His supervisor asked the defendant for his name and requested that he open the case. Defendant refused and was placed under arrest. Defendant was read his rights and the briefcase was opened. The briefcase was found to contain a .25 caliber automatic and a wallet with identification in the name of Peter Grant Grainger. The gun was loaded. There was also a gun permit in the briefcase.

Defendant claims that the trial judge erred by denying his motion to suppress the gun seized from his locked, checked luggage because defendant's briefcase was unconstitutionally seized and searched.

The people maintain that the search and seizure were permissible for two reasons: 1) the defendant has no standing because he denied owning the briefcase so he had no reasonable expectation of privacy; and 2) defendant's behavior and statements constituted a voluntary consent to the search of his briefcase.

At the suppression hearing held prior to trial, the trial judge found that the evidence should not be suppressed because the defendant had no expec-

tation of privacy in the briefcase since he twice denied that it was his briefcase. Further, the trial judge found that the defendant impliedly consented to the search because he had an opportunity not to take the flight and not to have the briefcase searched, but instead proceeded to the concourse area where the checkpoint was located. Also, the trial judge stated that, considering the circumstances surrounding the search, he believed that the officer acted reasonably. This Court will not reverse a trial judge's ruling on a suppression motion unless that ruling is found to be clearly erroneous. *People v Young,* 89 Mich App 753; 282 NW2d 211 (1979), *lv den* 407 Mich 877 (1979), *People v Ulrich,* 83 Mich App 19; 268 NW2d 269 (1978).

In *United States v Henry,* 615 F2d 1223 (CA 9, 1980), the court stated that an x-ray scan is clearly a search and is therefore subject to the requirements of the Fourth Amendment because the x-ray scan system is used as part of a screening system required by the federal government. In *Henry,* the defendant attempted to check his briefcase, but because he was wearing an ill-fitting wig and a couple of sets of clothing and appeared to be nervous, he was told that the airline had closed the luggage acceptance for that flight and he would have to take the bag to the gate where it could be loaded as checked luggage. At the security checkpoint, the security agent ran the briefcase through the scanner twice. She asked the defendant to open it, but the defendant stated that he did not have a key to open it. Subsequent events led to the opening of the case. With regard to the first x-ray scan, the court found that the scan was a reasonable procedure and that the defendant impliedly consented to it. The court

noted that the defendant had not been ordered or compelled to produce the briefcase for the initial scan but was free to take the briefcase and leave the airport or to board without taking or checking the briefcase rather than submit it to the x-ray scan. Further, the court noted that the initial use of the x-ray scan produced no evidence, although it led to the later discovery of evidence, and the x-ray was used only to determine whether a further physical search was indicated.

*Henry* is factually distinguishable from the case at bar in that the defendant in *Henry* physically carried the briefcase to the checkpoint himself. In the case at bar the actual carrying was done by Mr. Tolstyka. Nonetheless, defendant herein made no objection and, after accompanying Mr. Tolstyka to the machine where the briefcase was x-rayed, he offered to open the briefcase for Ms. Duchesne. These facts indicate that the initial x-ray scan was done with defendant's implied consent.

At this point, however, the police officer arrived. The defendant refused to open the briefcase for him, stating that the bag was not his but belonged to a friend of his. The people contend that under these facts the defendant lacks standing to challenge the subsequent search.

The proper test for determining whether a defendant has standing to dispute a search and seizure is whether he has a legitimate expectation of privacy in the searched area. *Rakas v Illinois,* 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978), *People v Wagner,* 104 Mich App 169; 304 NW2d 517 (1981).

The trial judge did not err in finding that the defendant had no legitimate expectation of privacy in the briefcase. Defendant disclaimed ownership and therefore had abandoned it. In *United States*

*v Canady,* 615 F2d 694 (CA 5, 1980), the defendant attempted to take a suitcase on board the plane with him but was asked at two different security checkpoints if his suitcase could be searched. The defendant consented, but when two cylindrical packages wrapped in tape were found, the defendant denied owning the suitcase. When the packages were opened, heroin was found. The court found that a defendant has no legitimate expectation of privacy in an abandoned or unclaimed suitcase. The court based its decision on *United States v Colbert,* 474 F2d 174 (CA 5, 1973) *(en banc),* and *United States v Anderson,* 500 F2d 1311 (CA 5, 1974).

In *Colbert,* as the police approached two defendants, the defendants set the briefcases they were carrying on the sidewalk and denied that they owned the briefcases. The defendants began to walk away from the officers, leaving the briefcases on the sidewalk. The court found that the defendants had abandoned their briefcases and therefore had no standing to challenge the search.

In *Anderson,* the defendant was arrested in an airport after having checked certain bags. The police recovered the bags, and the defendant claimed ownership of one of the bags but disclaimed ownership of the other. The bags were searched without a warrant and a pistol and other incriminatory evidence were found in the unclaimed bag. The court found that the pistol and the other evidence were admissible because the defendant had abandoned the bag. Thus, the defendant had no expectation of privacy and lacked standing to challenge the search of the unclaimed suitcase.

In the present case, Duchesne and the police officer testified that the defendant twice denied

that the briefcase was his. The defendant told them that it belonged to a friend. To the contrary, the defendant testified at the suppression hearing that he never claimed that the bag was not his. Presented with this conflicting evidence, the trial judge chose to believe Duchesne and the police officer, finding their testimony more credible than the defendant's. The trial judge is in the best position to judge the credibility of the witnesses. Under these circumstances the trial judge's finding that the defendant had no legitimate expectation of privacy in the briefcase was not clearly erroneous. Accordingly, the trial judge did not err in denying defendant's motion to suppress the evidence.

Defendant next claims that his statements to the police officer denying ownership of the briefcase should not have been admitted in evidence because he had not been advised of his *Miranda*[1] rights. Defendant claims he was sufficiently in custody and the focus of suspicion to require a warning and waiver of his *Miranda* rights at this point.

We find that, even assuming defendant was in custody, his statement need not have been denied admission because the statements were not the product of interrogation. In *People v Benjamin*, 101 Mich App 637, 647-648; 300 NW2d 661 (1980), the Court discussed "interrogation":

"In *Rhode Island v Innis*, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980), the United States Supreme Court addressed the question of what constitutes 'interrogation' under *Miranda*. After noting that not all statements obtained by police after a person has been taken into custody are considered products of 'interrogation'

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

and that volunteered statements of any kind are not barred by the Fifth or Fourteenth Amendments, the Court indicated that 'interrogation', as contemplated in *Miranda,* must reflect a measure of compulsion above and beyond that inherent in custody itself. The Court continued:

" 'We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' 100 S Ct 1689-1690. (Footnotes omitted; emphasis in original.)"

In a footnote, the Court stated that *Innis, supra,* also indicated that whether the police officer was aware of any unusual susceptibility of the defendant to any particular form of persuasion, whether by word or deed or that the officer perceived the defendant to be unusually disoriented or upset at the time are factors that may affect the determination as to whether a police practice constitutes interrogation under *Miranda.*

Defendant's responses in the case at bar were not the product of custodial interrogation. The defendant was asked to open his briefcase. He responded that the briefcase did not belong to him. It is not apparent from the record that Officer Sumeracki knew or should have known that he was likely to elicit an incriminating response from the defendant. It is customary in an airport setting to ask a person to open his or her suitcase after a suspicious item is detected by the x-ray scanner. The defendant's response, that the briefcase did not belong to him, appears to be a voluntary, unsolicited statement to the police officer's request to open the briefcase and thus was admissible in evidence.

Defendant next claims that the prosecutor should not have been allowed to argue the validity of defendant's concealed weapons permit to the jury. We agree.

At trial, the prosecutor was allowed to introduce evidence for the purpose of establishing that defendant's concealed weapons permit had been revoked prior to the date of the offense. Testimony showed that a letter was sent by the Oakland County Concealed Weapons Licensing Board to the address listed on defendant's permit application giving defendant notice to appear at a permit revocation hearing. The notice stated that failure to appear would result in automatic revocation of the permit. Defendant did not appear and his license was revoked as of September 13, 1977. The notice of hearing was later returned as undeliverable. By further testimony the prosecutor attempted to imply that defendant resided at the address but refused delivery of the notice.

On April 24, 1978, defendant filed suit against the licensing board concerning the revocation of

his concealed weapons permit. A hearing was held at which the licensing board was represented by corporation counsel and the issue was argued.

On September 29, 1978, an order signed by the circuit court judge was entered. Defendant's permit was thereby restored *nunc pro tunc* to September 13, 1977. The order further stated that the licensing board's revocation of defendant's permit on September 13, 1977, was set aside and held for naught, apparently due to lack of proper notice to defendant.

At the trial of the case at bar the jury was instructed that it was to determine whether defendant's license was revoked at the time of the offense, as contended by the prosecutor, or whether it was valid and in full force, as argued by defendant. With respect to the Oakland County Circuit Court order the jury was instructed as follows:

"I instruct you that you may determine based on Oakland County Circuit Judge Robert Templin's order of September 29, 1978, Exhibit #16, that the defendant's gun permit was never revoked."

We find that it was error for the judge to submit to the jury the question of the validity of the license. The prior circuit court order had already determined that the permit was not revoked. The jury could not otherwise determine the issue.

The doctrine of collateral estoppel precludes relitigation of an issue in a subsequent suit involving the same parties based upon a different cause of action. *Topps-Toeller, Inc v Lansing,* 47 Mich App 720, 727; 209 NW2d 843 (1973). Although the prior circuit court case involved the licensing board, whereas the present case involves the Wayne County Prosecutor, these parties are suffi-

ciently identical for purposes of application of collateral estoppel. Each is a creature of the same sovereign, the State of Michigan. See *People v Watt,* 115 Mich App 172; 320 NW2d 333 (1982).

The error requires reversal and a new trial in this case. Two theories of guilt were submitted to the jury: (1) that defendant had a invalid permit, and (2) that defendant had a valid permit but was carrying the gun in violation of certain license restrictions. The first theory, we have held, should not have been submitted to the jury.

The second theory, that defendant had a valid permit but was carrying the gun in violation of the license restrictions, was proper grounds for conviction of defendant. The permit authorized carrying the gun "for business, bank and home, hunting and target". Defendant contended that he was going to Florida on a business trip and the license allowed him to carry the gun for business purposes. The testimony of defendant's employer supported his claim. He testified that he sent defendant to Florida to attend a business meeting in his place. However, other evidence established that defendant purchased a one-way ticket, traveled under an assumed name, paid for the ticket with cash, and denied ownership of the briefcase. These facts could indicate that the defendant was not traveling to Florida for business purposes.

Evidence further established that, although the gun permit allowed defendant to use the gun for the purpose of carying large amounts of money from his place of business to the bank or his home, defendant had not been asked by his employer to carry a large amount of money to Florida. Therefore, even if the jury believed that defendant was going to Florida on business, it could have found that the gun was being carried outside the confines

of the license restrictions, since large amounts of money were not involved in the trip. Sufficient evidence was adduced to convict defendant under the prosecution's second theory.

Where one of two alternative theories of guilt is legally insufficient to support a conviction, and where it is impossible to tell upon which theory the jury relied, the defendant is entitled to a reversal of his conviction and a new trial. *People v Olsson,* 56 Mich App 500, 505; 224 NW2d 691 (1974). Such is the case here. The second theory would support a conviction, the first would not. We cannot tell upon which theory the jury relied.

Accordingly, defendant's conviction is reversed and the case is remanded for a new trial in accordance with this opinion.

BRONSON, J. *(concurring).* I concur in the majority's decision to reverse this case. I generally agree with the majority's statement of the facts. However, I believe additional explication is necessary to resolve the constitutional issues raised and will set forth these additional facts with the analysis sections of my opinion. I disagree that the facts of this case support the majority's conclusion that the search and seizure conducted here was constitutionally permissible.

I

The prosecution does not dispute defendant's assertion that the search and seizure here came within the purview of both the Fourth Amendment to the federal constitution and Const 1963, art 1, § 11. See *United States v Henry,* 615 F2d 1223, 1227 (CA 9, 1980). In *Henry,* since the government conceded the applicability of the Fourth Amendment, the court did not dwell on setting

forth a rationale for this finding. However, in *United States v Davis*, 482 F2d 893 (CA 9, 1973), the court discussed at great length the government's pervasive role in the execution of airport searches designed to minimize hijackings. The court characterized the nationwide anti-hijacking program as having been "conceived, directed, and implemented by federal officials in cooperation with air carriers". *Id.*, 897. Following a discussion of the history of airplane hijackings in the United States and the various programs implemented by the authorities to combat hijackings, including magnetometer screening of all passengers and searches of carry-on luggage, the court concluded:

"It is entirely clear from the materials summarized above, however, that throughout the period since late 1968 the government's participation in the development and implementation of the airport search program has been of such significance as to bring any search conducted pursuant to that program within the reach of the Fourth Amendment.

"The government's role in the airport search program is and has been a dominant one. But even if governmental involvement at some point in the period could be characterized accurately as mere 'encouragement,' or as 'peripheral, or * * * one of several cooperative forces leading to the [alleged] constitutional violation,' see *United States v Guest*, 383 US 745, 755-756; 86 S Ct 1170, 1177; 16 L Ed 2d 239 (1966), that involvement would nevertheless be 'significant' for purposes of the Fourth Amendment. Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by 'private' persons or entities that is prohibited to the government itself." *Id.*, 904. (Footnote omitted.)

See, also, Note, *The Constitutionality of Airport Searches*, 72 Mich L Rev 128, 134-137 (1973).[1]

---

[1] The specific method used to conduct the initial screening here was

I further note that the majority of courts which have considered the issue of whether magnetometer screening constitutes a search have held in the affirmative. See, *e.g., United States v Bell,* 464 F2d 667, 672-673 (CA 2, 1972), *cert den* 409 US 991; 93 S Ct 335; 34 L Ed 2d 258 (1972), *United States v Slocum,* 464 F2d 1180, 1182 (CA 3, 1972). A magnetometer examination merely detects a concentration of amounts of unspecified metals. The x-ray search under consideraton here, however, actually projected an image of the inside of a closed container. Obviously, then, if magnetometer examination implicates Fourth Amendment protections, the more intrusive x-ray search does. It is an act of futility to attempt to distinguish, for Fourth Amendment purposes, magnetometers and other electronic screening devices such as the x-ray machine. See, Comment, *Searching for Hijackers: Constitutionality, Costs, and Alternatives,* 40 U Chi L Rev 383, 403 (1973). Pervasive governmental involvement in airport searches mandates a finding of sufficient governmental action to trigger the panoply of constitutional rights prohibiting unreasonable searches and seizures.

---

discussed in Andrews, *Screening Travelers at the Airport to Prevent Hijacking: A New Challenge for the Unconstitutional Conditions Doctrine,* 16 Ariz L Rev 658, 703-704 (1974), as follows:

"(2) *Low-level x-ray weapon detector check.* Under this procedure, the carry-on baggage remains shut and is passed on a conveyor belt through the detector. Some of these devices project onto a television-type screen an image of the objects inside each piece of baggage, while others appear to project only a complex of lines which enable a trained monitor to deduce the size and nature of each such object. This procedure also invades privacy, although to a lesser degree than the manual inspection since the bag remains closed and there is no indiscriminate viewing of its contents or disruption of their order. However, the very process of projecting even an imprecise image of the shape and relative location of all items in any deliberately closed container is so similar to actually looking into the container as to partake of the essence of a search. The x-ray weapons detector does amount, then, to a search within the fourth amendment." (Footnote omitted.)

II

The majority has no difficulty in concluding that defendant consented to the search because he made no objection to the airline employee, Robert Tolstyka, taking the briefcase to be x-rayed and because defendant offered to open the briefcase for Linda Duchesne, a security guard.

The prosecution has the burden of proving that, under the totality of the circumstances, consent to search was freely and voluntarily given. *Schneckloth v Bustamonte,* 412 US 218, 222; 93 S Ct 2041; 36 L Ed 2d 854 (1973), *United States v McCaleb,* 552 F2d 717, 721 (CA 6, 1977), *People v Reed,* 393 Mich 342, 362-363; 224 NW2d 867 (1975), *cert den* 422 US 1044; 95 S Ct 2660; 45 L Ed 2d 696 (1975), *People v Whisnant,* 103 Mich App 772, 775-777; 303 NW2d 887 (1981), *lv den* 411 Mich 960 (1981). I do not believe the prosecution met its burden here.

The record in this case shows that defendant was not told that he could avoid the search of his briefcase by declining to fly. He was not told that he could refuse consent. Nor does the record show that warning signs were posted at the ticket counter, where this incident initially arose, advising defendant that checked-in baggage was subject to search or that he had a right to refuse the search. In addition, the record reveals that at the time Tolstyka told defendant that his bag had to be searched, it was then in the exclusive control of airline and/or security personnel.

In my opinion, all the record before us establishes is acquiescence to a claim of lawful author-

ity to search. Such acquiescence is insufficient to show consent. *United States v Ruiz-Estrella,* 481 F2d 723, 727 (CA 2, 1973), *United States v Rothman,* 492 F2d 1260, 1265 (CA 9, 1973). The facts of this case are akin to those presented in *Ruiz-Estrella,* where consent to search was found to be lacking. In *Ruiz-Estrella,* defendant matched the hijacking profile.[2] He was escorted by an airline gate agent to a uniformed sky marshal. Defendant could not produce satisfactory identification, and the marshal told him he would have to go through a baggage search. Thereupon, defendant handed over the shopping bag he was carrying which contained a sawed-off shotgun. The court found that there had been mere acquiescence to a claim of lawful authority.

Assuming that I am wrong concerning the effectiveness of defendant's "consent" to the x-ray search, I would still conclude that the firearm had to be suppressed. There were actually two searches here, the x-ray examination which revealed a gun inside the briefcase and the actual opening of the briefcase and the seizure of the gun.

The issue of consent with respect to the x-ray examination presents a close question. However,

[2] All the airline officials who testified here refused to divulge what the "hijacking profile" consists of. Rather, they stated that the profile information is secret, not written down, and is changed from time to time. As such, it is impossible for us to ascertain if the profile actually justified an investigatory stop based on reasonable suspicion that criminal activity might be afoot. In some cases the presence or absence of such a reasonable suspicion might be dispositive of the search and seizure issue. I, for one, have no intention of abdicating my judicial responsibility to make a determination of whether an investigatory stop is supported by reasonable suspicion. If the airline security officials are unwilling to divulge just why a defendant was deemed to fit the hijacking profile, I will be left with no alternative but to conclude that the prosecution did not meet its burden of establishing the propriety of the initial stop.

the subsequent opening of the case is not particularly close.

The majority focuses on the fact that defendant offered to open up the case for Duchesne as showing consent. Exclusive reliance on defendant's willingness to open the case for Duchesne, however, ignores the fact that when Officer Jerry Sumeracki came to the checkpoint, defendant refused to open the briefcase. Sumeracki admitted before the trial court that, at this point, defendant was in custody and not free to leave. Ultimately, the police, without a search warrant, opened the briefcase when defendant continued to refuse to do so. I believe that the physical search of the briefcase was conducted without consent and that the contrary result can only be reached by a strained reading of the record.

I conclude that the physical search was not valid based upon defendant's "consent". Moreover, there were no exigent circumstances which justified the search. The police officers had probable cause to believe defendant was guilty of carrying a concealed weapon after the x-ray scan. However, no exigent circumstances justified the subsequent warrantless search. The briefcase was immobile in police custody. See *United States v Chadwick,* 433 US 1, 13; 97 S Ct 2476; 53 L Ed 2d 538 (1977), *Arkansas v Sanders,* 442 US 753, 763; 99 S Ct 2586; 61 L Ed 2d 235 (1979), *People v Plantefaber,* 410 Mich 594, 603-604; 302 NW2d 557 (1981), *cert den* 454 US 975; 102 S Ct 527; 70 L Ed 2d 396 (1981), *People v Miller,* 110 Mich App 270; 312 NW2d 225 (1981).

III

In light of my conclusion that defendant did not

consent to the search and seizure here, I must
analyze whether, under *Rakas v Illinois,* 439 US
128; 99 S Ct 421; 58 L Ed 2d 387 (1978), defendant
had a reasonable expectation of privacy in the
briefcase such that it may be concluded that his
Fourth Amendment rights were violated. I con-
clude that defendant did enjoy a reasonable expec-
tation of privacy in the briefcase. Before setting
forth my reasons for this conclusion, however, I
desire to go on record as stating that I disagree
with the majority that the *Rakas* "reasonable
expectation of privacy in the searched area" analy-
sis is the law in Michigan for determining if an
individual's Fourth Amendment rights have been
violated.

In *People v Nabers,* 103 Mich App 354, 375; 303
NW2d 205 (1981), *rev'd in part on other grounds*
411 Mich 1046; 309 NW2d 187 (1981), I noted that,
as a matter of state constitutional law, the courts
of this state have traditionally afforded the citi-
zenry greater protections against unreasonable
searches and seizures then have been extended by
the United States Supreme Court. Since *Nabers,* I
have had occasion to criticize *Rakas* in *People v
Chernowas,* 111 Mich App 1; 314 NW2d 505 (1981),
and my concurring opinion in *People v Wagner,*
114 Mich App 541; 320 NW2d 251 (1982). Since
then, one panel of this Court has declined to apply
*Rakas,* finding as a matter of state constitutional
law that, under article 1, § 11, of the Michigan
Constitution of 1963, the rule of automatic stand-
ing and the doctrine that anyone legitimately on
the premises where the search occurred may chal-
lenge its legality from *Jones v United States,* 362
US 257; 80 S Ct 725; 4 L Ed 2d 697 (1960),
continue to apply in Michigan. See *People v*

*Smith,* 118 Mich App 366; — NW2d — (1982). I agree with the rationale of my colleagues in *Smith,* but make the following additional observations which I believe lends further support for the proposition that the Michigan Constitution should be construed to continue to support "automatic standing".

The Michigan courts applied the exclusionary rule long before such application was mandated by *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). See *Nabers, supra.* An examination of some of these early decisions reveals that defendants who would be found to have no constitutionally protectable Fourth Amendment rights under *Rakas* were nonetheless not thrown out of the state courts because of a lack of standing. See, *e.g., People v Stein,* 265 Mich 610; 251 NW 788 (1933) (defendant was one passenger in a taxicab, did not own the cab, and was manifesting his criminal behavior in front of the cabbie and the other passenger),[3] *People v Orlando,* 305 Mich 686; 9 NW2d 893 (1943) (search of car belonging to neither of the codefendants). In light of the fact that pre-*Mapp* search and seizure law in Michigan did not develop *Rakas*-like standing requirements, I see no reason to conclude that they should be developed now.

Despite the foregoing, I would conclude that if the search and seizure here violated the Michigan Constitution, but defendant did not have a "legitimate expectation of privacy" under *Rakas,* defendant's conviction could not permissibly be re-

---

[3] In *People v Bissonette,* 327 Mich 349, 352-353; 42 NW2d 113 (1950), the Court noted that the anti-exclusionary provision now appearing in Const 1963, art 1, § 11, was a result of the *Stein* decision.

versed. Const 1963, art 1, § 11 contains an anti-exclusionary provision, prohibiting the suppression of, among other things, firearms seized outside the curtilage of any dwelling house. In my opinion, this anti-exclusionary provision must be given effect in any case in which suppression of the evidence would not result under federal constitutional doctrines, but which would result in suppression as a matter of state constitutional law but for the anti-exclusionary provision. This position is in accordance with the Michigan Supreme Court decision in *People v Gonzales,* 356 Mich 247; 97 NW2d 16 (1959). There, prior to the United States Supreme Court decision in *Mapp,* the Michigan Supreme Court held that the anti-exclusionary provisions of Const 1908, art 2, § 10, now embodied in Const 1963, art 1, § 11, were not barred by the federal constitution. *Gonzales* is again controlling law in Michigan now that the United States Supreme Court has created more exceptions to the requirement of suppression as a remedy for the violation of Fourth Amendment interests and has disposed of doctrines which made it easier than is true today for defendants to challenge the validity of police searches.

Since the weapon in this case could not be suppressed under the anti-exclusionary provision of the Michigan Constitution, I turn to the question of whether, under *Rakas,* defendant had a reasonable expectation of privacy in the briefcase. It is the majority's position that after defendant denied the briefcase was his, he had abandoned it and any expectation of privacy he might have had in the same. I acknowledge that, at present, the great weight of authority supports the majority. However, in my opinion this authority does not adequately analyze the issue.

The United States Supreme Court has not clearly resolved the issue of "abandonment". However, what applicable Supreme Court authority does exist I believe supports a result contrary to the majority's position. In *Rios v United States,* 364 US 253, 262, fn 6; 80 S Ct 1431; 4 L Ed 2d 1688 (1960), the Supreme Court rejected the prosecution's abandonment theory where the defendant dropped a package containing narcotics to the floor of a taxicab and then attempted to flee. The Court's decision was apparently premised on the theory that the taxicab constituted a "protected area". The notion of protected areas was subsequently rejected in *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967). If the taxicab had not been a "protected area", the issue of whether abandonment had occurred need not have been reached. All the same, it is unclear from *Rios* just what the Supreme Court believed the relationship between "protected areas" and abandonment was. *Rios* is nonetheless interesting in that the Supreme Court clearly rejected the notion of "abandonment".

Of more interest to me is the Supreme Court's summary rejection of the prosecution's abandonment theory in *Walter v United States,* 447 US 649, 658, fn 11; 100 S Ct 2395; 65 L Ed 2d 4109 (1980), where the Court said:

"Nor can petitioners' failure to make a more prompt claim to the Government for return of the films be fairly regarded as an abandonment of their interest in preserving the privacy of the shipment. As subsequent events have demonstrated, such a request could reasonably be expected to precipitate criminal proceedings. We cannot equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any inter-

est in the contents of the cartons. In any event, the record in this case does indicate that the defendants made a number of attempts to locate the films before they were examined by the FBI agents."

In my opinion, this excerpt from *Walter* is applicable to this case. Defendant's statement that he did not own the briefcase was obviously made to avoid criminal proceedings against him. It is clear that defendant did not intend to relinquish or abandon the briefcase. The statement was made under the coercion of police custody. Even as the statement was made, defendant did not voluntarily give up the case; rather, he offered his lack of ownership as a reason for keeping the briefcase, with its incriminating evidence, closed. Defendant's act of prevarication was an attempt to preserve his privacy in the contents of his briefcase and to vindicate his expectation of privacy in the same.

In *United States v Tolbert,* 517 F Supp 1081, 1086-1094 (ED Mich, 1981), Chief Judge Feikens' opinion constitutes what I consider to be the definitive analysis of what actions precipitated by police confrontation should be construed as an "abandonment" of Fourth Amendment rights in the searched item. Applying Justice Harlan's test for determining whether a reasonable expectation of privacy exists in a searched area from *Katz, supra,* and later accepted by a majority of the Supreme Court in *Smith v Maryland,* 442 US 735; 99 S Ct 2577; 61 L Ed 2d 220 (1979), Judge Feikens found that the defendant in *Tolbert* had not abandoned her property. Justice Harlan's concurrence in *Katz* imposes a twofold requirement for determining if a reasonable expectation of privacy exists: (1) that the person whose property has been searched exhibits a subjective expectation of privacy, and (2)

that this expectation is one society is prepared to deem as reasonable.

Here, defendant exhibited a subjective expectation of privacy in the briefcase up until the time it became clear that Officer Sumeracki intended to examine its interior. I agree with Judge Feikens' *Tolbert* decision that the abandonment of this subjective expectation at the time of the police confrontation does not negate defendant's Fourth Amendment interests in the property. As Judge Feikens indicates:

"If 'reasonable expectations of privacy' define the range of protected Fourth Amendment interests, there is no reason to exclude her interest from the protection of the Amendment because she lost her actual expectation of privacy when the police approached. The coverage of the Fourth Amendment does not expand or contract to match a person's expectations about police behavior. Certainly, no one would contend that police may conduct a night-time raid without probable cause if the frightened homeowner has anticipated that it will occur.

\*    \*    \*

"In an 'abandonment' case, the defendant takes 'normal precautions to maintain his privacy', demonstrates a subjective expectation of privacy until the police arrive. After police confront him, his actual expectation of privacy is influenced heavily by his personal reaction to their presence. He may or may not expect his privacy to be jeopardized, depending upon his attitudes about police and his knowledge of Fourth Amendment law. Society's interest in the admission of incriminating evidence is no greater when the defendant's personal reaction to police includes loss of his expectation of privacy than it is in other cases. In fact, the need for deterrence may even be greater if the defendant has openly revealed his cynical expectations about police behavior." *Id.,* 1091-1092. (Footnotes and citations omitted.)

As to the second prong of Justice Harlan's test, I think no doubt exists but that a person in possession of a locked briefcase has a reasonable expectation in the briefcase's contents which is recognized as legitimate by society. I further agree with the following excerpt from *Tolbert:*

"Of course, the usual explanation of 'abandonment' is that the defendant's disclaimer destroys the legitimacy of his privacy interest. * * *

"First, if the 'reasonable expectation of privacy' standard is a limit of the substantive scope of the Fourth Amendment, the disclaimer does not remove defendant's privacy interest from the group of 'legitimate' or 'reasonable' privacy interests protected by the Amendment. She still owns the luggage, and still has an interest in the privacy of her 'papers, and effects.' US Const, Am IV. Society's interest in the protection of her personal privacy remains as strong after the disclaimer as before it.

"At least in police confrontations, 'abandonment' is really a doctrine of forfeiture or estoppel. A person realizes that his property is about to be searched, panics, and desperately tries to disown it. By the disclaimer, he is hopelessly trying to preserve his privacy. Of course, the lie is ignored, and the search proceeds. Yet, because of an absurd, pathetic statement which no one believes, he forfeits constitutional protection of his privacy. I find no precedent for attaching such a penalty to lying to the police.

"Second, if the standard is really a limitation of the exclusionary rule, defendant's 'abandonment' has not created the need for an exception to the rule. In *Schneckloth v Bustamonte, supra,* the Supreme Court recognized that deterrence of police misconduct plays no role in situations in which the police have relied in good faith upon a consent which appeared to be knowing and voluntary. Therefore, they refused to apply the exclusionary rule in 'voluntary consent' cases.

"No good faith reliance is present in a case of so-called 'voluntary abandonment'. The police do not rely

on the disclaimer. On the contrary, the search proceeds upon the assumption that the defendant is lying. The dynamics of the situation do not change. Whether or not the exclusionary rule actually serves its purpose, the need for deterrence of police misconduct remains.

"In fact, 'abandonment' actually presents a relatively appealing case for application of the rule. It is not a situation in which 'the criminal is to go free because the constable has blundered.' The 'abandonment' theory enables police intentionally to circumvent the privacy protections of the Fourth Amendment. They may approach a 'suspicious' person and try to pressure him into 'abandoning' his property. If they fail to coerce 'abandonment', their actions are never scrutinized by a magistrate. If they succeed, they are free to search the 'abandoned' property, and seize whatever they find. They have no warrant. They have no probable cause to believe that they will discover evidence of a particular crime. They simply go fishing. Their conduct is reviewed only when they catch something. The exclusionary rule was created specifically to deter this kind of systematic violation." *Id.,* 1093-1094. (Footnotes and citations omitted.)

My belief that defendant did not abandon his case is also reinforced by my opinion that prior to the time that defendant disclaimed ownership of the case, he should have been advised of his *Miranda*[4] rights. We need not merely assume, as the majority has, that defendant was in custody. Officer Sumeracki admitted that he would not have let defendant leave had the latter tried to go.[5] The question of interrogation is only a little closer. I first note that on cross-examination, Officer Sumer-

[4] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] I still adhere to the position that focus, rather than custody, is the correct test to apply in Michigan for determining if *Miranda* warnings must be given. See *People v Wallach,* 110 Mich App 37, 47-50; 312 NW2d 387 (1981). In this case, however, both the focus and custody tests compel the same result, *viz:* that *Miranda* warnings should have been given.

acki admitted asking defendant who owned the case. However, whether this occurred prior to or after defendant said that his friend owned the briefcase is not clear on the record. Nonetheless, under either version of the events in issue, I believe that pursuant to *Rhode Island v Innis,* 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980), interrogation did occur here.

Defendant was asked to open his case. By Officer Sumeracki's admission, defendant responded, "why?" Sumeracki answered, "because the outline of a gun was seen in the bag. We have to have it opened." Defendant then said the case belonged to a friend. As *Tolbert, supra,* makes abundantly clear, this is the typical scenario leading to a prosecutorial claim of abandonment. Far from defendant's response appearing "to be a voluntary, unsolicited statement", it seems to me that this is precisely the kind of response Officer Sumeracki's conversation with defendant would be expected to elicit. I conclude that defendant's Fourth and Fifth Amendment rights were violated well before the police opened the briefcase without consent.