**UNITED STATES of America,**
**Plaintiff,**

v.

**Terry COFIELD, Defendant.**

**No. 99–6244–CR.**

United States District Court,
S.D. Florida.

Aug. 14, 2000.

Laurence M. Bardfeld, Ft. Lauderdale, FL, for plaintiff.

Patrick M. Hunt, Ft. Lauderdale, FL, for defendant.

### *(CORRECTED) ORDER ON OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION ON THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

FERGUSON, District Judge.

This is a passenger train station stop and search case based on a profile. It led to the discovery of a little over one (1) kilogram of cocaine base in the defendant's duffel bag. The defendant, a twenty-nine (29) year old African–American male, claims that the detention and warrantless search of his luggage violated his constitutional right to be free from an unreasonable search and seizure.[1] The arresting officers claim that the bags they searched had been abandoned by the defendant. After an evidentiary hearing where two police officers, the defendant and his girlfriend testified, the Magistrate Judge found

> the testimony of Detective Wolfkill and Sergeant Cooperman to have been fully credible. This determination is based upon each officer's demeanor and manner of testifying, as well as the consistency and logic of their rendition of the events of October 19, [1999]. By contrast, the testimony [of] the defendant was internally inconsistent and somewhat at odds with the testimony of Ms. Gibson. Moreover, the defendant is facing a very severe sentence and has a strong motive to fabricate his testimony.

The cause is before the Court on the defendant's Objection To The Magistrate Judge's Report and Recommendation [D.E. 22].

#### *Issue*

The single issue presented by the unique facts is whether the defendant abandoned his bag and any expectation of privacy after a warrantless stop and search conducted over protest. The legality of the initial stop is not an issue. Neither is

---

1. These facts are noteworthy because they fit a pattern discussed in a widely-publicized study on racial inequities in the nation's war on drugs. In the state of Florida blacks are 13.4 times more likely to be arrested and imprisoned for drug offenses than whites even though whites make up over 85% of the population and use and traffic in drugs five times more than blacks. *See* 12 Human Rights Watch 2(G), *Punishment and Prejudice: Racial Disparities in the War On Drugs* § VI. fig. 8 (May 2000). According to the report blacks constitute 74% of incarcerated drug offenders in the state. *See id.* at § VI. tab. 13. In what one of the researchers describe as a "national scandal" the blame is placed mainly on how the laws are enforced. Blacks and their neighborhoods are targeted for massive street sweeps, buy and bust operations, and stops based on racial profiles. *See id.* at § VI.

Although the principle issue at the hearing on the motion to suppress was whether the defendant abandoned his drug-filled bag, these judicially-noticeable facts about drug arrests are relevant to witness credibility determinations particularly as they bear on the officers' testimony that the defendant voluntarily relinquished a known right.

there any disagreement that the defendant twice denied the officers' request for permission to search his luggage. In this *de novo* review of the proceedings before the Magistrate Judge the Court has considered the entire transcript of testimony produced at the hearing, the secretly recorded audio-tape of conversations between the defendant and his girlfriend made in the backseat of a police cruiser, along with the arguments of counsel.

### Facts

There are of course two versions of the facts. Both versions are distilled here for the purpose of the review.

*Government's version.*

First to testify was Detective Robert Wolfkill of the Broward County Narcotics Unit. He testified that he sometimes works train stations, bus stations and airports for drug interdiction; that on the date of this arrest he arrived at the train station at 10:30 a.m. to conduct surveillance on passengers that were going to be departing at 11:30 a.m. riding the northbound train. Wolfkill said he "began to mill about the platform ... looking for suspicious people that are acting above and beyond that we normally see with law-abiding passengers." His attention was drawn to the defendant because initially he seemed to have no luggage, which he thought unusual for "law-abiding passengers" and he "appeared to be walking back and forth from the office area to the parking lot, walking around the building kind of aimlessly." Wolfkill, who said that he was dressed so as to not appear a law enforcement officer, kept the defendant under surveillance. About a half hour later other members of his unit arrived and they discussed the defendant, agreeing among themselves that he looked suspicious.

"Just shortly prior to the train arriving" he testified, we observed the defendant go to the parking lot, remove two bags from a parked vehicle, and walk toward the train. According to Wolfkill it is a common practice of drug smugglers to leave their narcotics in a stationary position away from themselves and then retrieve them at the last minute before boarding the train. A decision was made to have the canine dog smell-search the luggage.

At a later point the defendant, now joined by his female companion, turned around and began to quickly walk back toward the parking lot. During his attempt to walk toward the car through the platform area the canine dog and the handler "paralleled him" and the dog began to sniff the air around his person and bag. The defendant was stopped, advised by Wolfkill and another officer, Sergeant Cooperman, that they were police officers and was shown a badge. The defendant, who was carrying the bags high on his shoulders, was asked for permission to search them.[2] According to Wolfkill he was "argumentative." He was told that the dog had alerted to narcotics and was asked a second time for permission to search. According to Wolfkill the defendant objected but then "took the bag off his left shoulder and his right shoulder, threw them on the ground, and advised us that the bags were not his." Cooperman, the other officer, began to search the bags as the defendant turned and walked away. A few seconds later the substance was discovered in the first bag examined and the defendant was apprehended and handcuffed.

The defendant and his female companion were placed in a marked police car where a tape recorder had been secreted to pick up conversations between the two.

Sergeant Cooperman's testimony about the apprehension and arrest was essentially the same except that he was clear that the defendant twice refused their requests for consent to search.

---

**2.** When asked by defense counsel whether it was common for him to obtain a search warrant in these types of operations Detective Wolfkill testified, "Actually, I have never gotten a warrant." Wolfkill admitted that in all prior cases, individuals had either consented to a search or articles were searched after being abandoned.

*Defendant's version*

The testimony of the defendant and his companion at the suppression hearing differed markedly from that of the detectives. The defendant testified that he arrived at the train station early and purchased a one way ticket to Mobile, Alabama. After purchasing the ticket and realizing that he had insufficient money for food he and his girlfriend, Barbara Gibson ("Gibson"), left the train station in order to find a convenient bank automatic teller ("ATM"). On return, they re-entered the station without the bags. After approximately a minute inside the station, the defendant left his girlfriend and returned to the car to retrieve the bags.

Gibson testified that she heard one of the detectives make a comment about the defendant, asking, "Where the hell is he going?" and she thereafter left the waiting area to tell the defendant what she had overheard. Suspecting that they were police officers the defendant, returning with the bags, decided to abandon the trip and turned about to leave the station. The defendant, tall and muscular, said he placed the bags on his shoulders to protect against a sniff by the small dog. As they proceeded toward their vehicle the detectives stopped them first asking for permission to search then ordering the defendant to drop his bags to allow a sniff by the dog. According to the defendant's companion, after the dog sniffed the defendant's bag, "[t]he officers took the bag and placed it on the bench." She testified further that the defendant never dropped or walked away from his bags but that the officers physically took the bags.

The defendant's testimony was consistent with that of Gibson. On direct examination he testified that the officer asked to search his bags but he refused. "And he [again] asked to search. I said no again. Then he said, 'I'm going to have to take the bags from you because the dog alerted.'" In response to the question on how he lost possession the defendant replied, "He took the bags." He further testified that he never dropped or abandoned his bags and that he never denied ownership of the items.

*The tape recording*

What makes this case different from most others where the credibility of the accused is pitted against that of the accuser is the recorded conversation between the defendant and his eight-month pregnant girlfriend which they thought was private. The officers testified that they were sure neither of the parties was aware that their conversations would be recorded. The defendant speaks first plotting Gibson's defense strategy and becomes irate that she may have something which could be used against her:

COFIELD: I just gave them my real name. That's is, you. You ain't got to tell 'em nothing until you see a lawyer. You know you ain't ... I'm gonna tell 'em you ain't have nothing to do with it, anyway. You know all I'm gonna tell 'em, all ... All you got to say ...

GIBSON: I told 'em, I just drop you off.

COFIELD: You did?

GIBSON: Huh-huh. What am I supposed to tell 'em?

COFIELD: You told 'em you were drop me off? Damn girl!

GIBSON: I told 'em, I just bring you from Miami.

COFIELD: You know, just tell him, you called, I called ... you, and ...

GIBSON: I told (unintelligible) cause (unintelligible) ...

COFIELD: I called you for some money. Babe I'm going away for a while babe. You know it don't you?

GIBSON: Uh-huh.

The defendant ponders the consequences, his miscalculation, and what he might have

done to avoid being linked to the illegal drugs:

COFIELD: I hope the state pick it up, if the state pick it up it's ... it's a mandatory 15 years. I'm gonna have to deal with that, 15 straight years. I seen ... we seen it too, huh?

GIBSON: Uh-huh.

****

COFIELD: Give me a kiss. I seen that shit ... I seen it, I seen it. And I knew what it was. That's why I left the damn bag [in the car][3], and I'm supposed to go with my first instinct ... and I should've dropped the bag and walked off. Huh? Huh?

GIBSON: Uh-huh.

COFIELD: Yeah. I should have ... They couldn't have pinned it on me. You know what I'm saying?

GIBSON: Uh-huh.

On reflection he seems to conclude that denying ownership would not have succeeded because of the likelihood that the officers had seen him with the bags earlier:

COFIELD: It would appeared they seen me with it (unintelligible) bag.

GIBSON: (Unintelligible).

COFIELD: Yeah it depends. You know, it'd be hard though..

The defendant expresses concern that the case might be turned over to federal prosecutors:

COFIELD: If the feds pick it up, I don't know what I might do. I might do like....

---

3. The bracketed words "in the car" follow logically in context and were added by the

He returns to her theory of defense, suggests that he has made this kind of trip before, and that the police claim of a dog alert was a ruse:

COFIELD: All you ... All you know is I called you to bring me some money. You needed some (unintelligible) money....

GIBSON: Uh-huh.

COFIELD: I hate Tuesdays. I always hate leaving on Tuesdays. I know when they are coming up ... That ... That dog (unintelligible) smell. That dog didn't.

COFIELD: And I told him he couldn't go in it, but they went in it anyway. You know?

GIBSON: I know that.

COFIELD: Babe they can't hold you. I'm telling you.

Near the end of the tape the defendant expresses concern for the child his companion is expecting, how the officers have twisted the facts, roughed him up and the dilemma of a life sentence or cooperating with the police:

COFIELD: If I need you, I'm gonna need you, cause the dog didn't smell shit.... You know what I'm saying. But they're gonna say he did. See, they knew I was trying to get away. You know what I'm saying: Just take care of the baby....

******

GIBSON: They asked you how do you know me?

COFIELD: I told 'em you was my girlfriend. What did he say?

GIBSON: He said, you told 'em you was my mama, I was your mother.

defendant in his testimony during the suppression hearing.

COFIELD: He a damn liar ... Babe, I'm telling you. That's why (unintelligible) you got that. That's why I didn't say nothing. You seen how they throw me on the floor?

GIBSON: Uh-huh.

COFIELD: Cause I wouldn't cooperate, and I was like, I need a lawyer first. He was like, I'll make sure you get life (unintelligible) which I probably can. You know what I'm saying: I am facing life. I don't know if ... Do you know what I'm saying? If they come with a plea bargain and my lawyer say, told me you know I'll ... If I have to take it babe. If it's alright, If not ... I don't know what ... You know. I think ... Cause the plea bargain is going to be ridiculous. If I don't cooperate. You know what I'm saying though.... [4]

Finally, the defendant reminds his companion to stick to the defense he has outlined for her:

COFIELD: Just ... All you came is to pick me up. I called you. I asked you, told you I needed $10.00 dollars. You told me okay. Let's go to the train.

GIBSON: I told 'em that.

COFIELD: That's it.

### Law of Abandonment

■ In determining whether there has been an abandonment, the "'critical inquiry is "whether the person prejudiced by the search ... voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search."'"

*United States v. Ramos,* 12 F.3d 1019 (11th Cir.1994) (quoting *United States v. Winchester,* 916 F.2d 601, 603 (11th Cir. 1990) (citation omitted)).

■■ Whether abandonment occurred is a question of intent which this Court may infer from words, acts, and other objective criteria. *See United States v. Pirolli,* 673 F.2d 1200, 1204 (11th Cir.) (holding that defendant had protectable privacy interest which had been clearly relinquished by words and acts), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982). While the defendant has the burden of proving a legitimate expectation of privacy in the areas searched, *see Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980), the burden of proving abandonment is on the government. *See United States v. Freire,* 710 F.2d 1515, 1519 (11th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1277, 79 L.Ed.2d 681 (1984).

---

**4.** The report referred to in note 1 is also critical of state police practices of sending a much higher number of drug cases against black defendants to federal court for prosecution where draconian federal sentencing guidelines apply.

It was probably not envisioned by the drafters of the guidelines, but is complained of by defendants, that state law enforcement officers use the Office of the United States Attorney and the threat of long sentences to compel users and low level dealers to become informants. *See, e.g., United States v. Strobridge,* Case No. 98–6040 Crim. (S.D.Fla., Nov. 30, 1998), (dismissing with leave to re-file in state court where two related cases against a young black male were split with the first being adjudicated in state court and the second handed over to federal prosecutor where, the defendant contended, the state court plea contemplated closure of both cases and the second case was filed because he refused to become an informant), *rev'd and rem'd with instructions to consider the retaliation issue in the federal prosecution,* Case No. 98–5858, —— WL —— (11th Cir. Aug. 7, 2000).

██ Generally, an individual enjoys a reasonable expectation of privacy in personal luggage. *See United States v. McKennon,* 814 F.2d 1539 (11th Cir.1987) (citing *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977)). However, one who abandons personal property may not contest the constitutionality of its subsequent acquisition by the police.

One may also abandon property by denying ownership of the property before it is searched by law enforcement officials. *See United States v. Colbert,* 474 F.2d 174 (5th Cir.1973) (en banc) (finding that defendants' disclaimer of any interest in briefcases and walking away precluded any finding of reasonable expectation of privacy); *United States v. Canady,* 615 F.2d 694 (5th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1982) (finding no expectation of privacy in suitcase or its contents where defendant repeatedly disclaimed ownership); *Pirolli,* 673 F.2d at 1204 (holding defendant abandoned bags later found to have cocaine when he denied ownership); *United States v. Hawkins,* 681 F.2d 1343 (11th Cir.1982) ("[defendant's] unsolicited and violent protest[ ] that he knew nothing about the ... suitcase [is] inconsistent with a claim of privacy interest in the suitcase and he cannot later successfully assert that claim.").

██ On the other hand, courts have found no abandonment of private property where there has been no clear renunciation of ownership prior to a police search. *See Smith v. Ohio,* 494 U.S. 541, 543–44, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990). In *Smith,* the defendant, carrying a brown paper bag, was approached by two plainclothes officers after he and a companion exited a private residence and entered a nearby parking lot. One of the officers, without identifying himself, attempted to stop and question the defendant. The de-fendant did not respond and continued walking. After the officer identified himself the defendant threw the bag he was carrying onto the hood of his car. The officers questioned the defendant as to the contents of the bag but he did not respond and instead attempted to protect the bag. The officer then pushed the defendant's hand away and opened the bag over the defendant's objections. The drug paraphernalia discovered within led to the defendant's eventual conviction for drug abuse. The Supreme Court reversed the conviction holding that "a citizen who attempts to protect his private property from inspection after throwing it on a car to respond to a police officer's inquiry clearly has not abandoned that property." *Smith,* 494 U.S. at 543–44, 110 S.Ct. at 1290. *See also United States v. Perea,* 986 F.2d 633 (1993) (finding that defendant, as bailee, had a privacy interest in duffel bag and had not abandoned privacy interest merely by placing bag in trunk of cab). From *Smith* it follows that a suspect who asserts a privacy interest in luggage by refusing consent to search and attempts to leave the area does not abandon the property after being detained.

### The Tape Recording As Substantive Evidence

At the hearing before the magistrate judge, both the defendant and his girlfriend testified that the luggage was not abandoned but was taken from the defendant by the detectives and opened on the train station platform after he denied their requests for consent. The fact that the defendant was unaware that his statements were being recorded, and had no suspicion that they might later reflect on his credibility in a judicial proceeding, weigh in favor of a finding that he had not abandoned the luggage. These independent statements corroborate the defendant's testimony and the argument of his counsel that the officers, after failing to obtain consent, nevertheless searched the luggage as was their intent the moment

they concluded that he did not look like a law-abiding citizen.

It is seldom that a defendant will be the beneficiary of his surreptitiously intercepted communications. They are quoted generously from the transcript because of the contextual significance. In an invasive manner the recording captures what the defendant knows to be the final intimate moments with his companion before a long prison stint to which he is resigned, an admission of prior unlawful conduct, along with a feeble attempt at expressing love and compassion for the plight of his lover and their soon-expected child.

Unlike the in-court testimony of either side it is free from the potentially discrediting factors which are ordinarily weighed in making credibility determinations: impression as telling the truth, interest in the outcome, directness in answering questions and consistency with the testimony of other witnesses. *See Eleventh Circuit Pattern Jury Instructions* (Criminal Cases) 21 (1997 revision). Like the dying declaration it was entitled to special reliability because of the expectation-of-privacy circumstances when made and the defendant's expressed state of mind—one of a "settled hopeless expectation." McCormick On Evidence, *Dying Declaration*, § 310, p. 307 (5th Ed.1999).

Undoubtedly if Cofield had been overheard on the audiotape making incriminating statements supportive of the government's version of the facts, i.e., that he had abandoned his bags prior to an assertion of privacy right or before the exercise by police officers of a lawful action, the government would have been making the argument, persuasively, that the court should give the statements considerable weight in making its credibility determinations. It is the indicia of reliability attached to the statements owing to the circumstances under which they were made that makes them credible. That credibility is not diminished by the fact that the statements support the defendant's rather than the police officers' accounts as to what really occurred.

## Conclusion

Abandonment in the criminal law requires voluntariness. There is no abandonment where the discarding of property or the disavowal of ownership follows and is merely the product of police misconduct. *Pirolli*, 673 F.2d at 1204 (citing *United States v. Lara*, 638 F.2d 892, 895 (5th Cir.1981)). After the defendant attempted to leave the train station and had twice asserted a privacy right in the bags he was carrying police officers, by their own testimony, persisted in their efforts to make a warrantless search.

Accepting the Government's version of the facts the alleged abandonment, after two adamant refusals to consent to a search, is at best equivocal. Here the defendant allegedly attempted to distance himself from the contraband-ladened duffel bag only after his attempt to leave the train station with the bags had been blocked; he carried the bags high on his shoulder ostensibly to prevent a dog sniff; he adamantly refused two request by police officers for consent to search; and he dropped the bags and attempted to flee the scene only after the officers made clear that they were going to be subjected to a sniff or physical search with or without his permission. The government's version of the facts are analogous to those cited above in *Smith*. The actions and statements of the defendant in this case when initially confronted were, likewise, inconsistent with an abandonment.

Ordinarily witness credibility findings made by a magistrate judge are not subject to reversal by a district judge without a new evidentiary hearing. The rule is not applicable however where the determination as to the correctness of the finding can be made on objective facts appearing in the record independent of subjective factors such as witness, demeanor or appearances. Here the magistrate judge, in making the critical credibility findings, gave little or no weight to the recorded conversations between the arrestees made in the back seat of the police vehicle. Be-

cause the statements made in that conversation were under circumstances showing that they were more likely true than untrue, they should have tilted the scale in favor of the defendant for the purpose of showing, at least, that the government had not carried its burden in finding abandonment as a matter of law.

It is the finding of this Court that the Government failed to show, on the strength of its own version of the facts, an unequivocal legal abandonment. Further, the defendant's version of the facts as supported by consistent statements made in a secretly recorded conversation, and in light of the fact that this began as a questionable profile stop · which, according to the officers, always results in warrantless searches, *see* note, *supra*, at 1376, was sufficiently reliable so as to resolve the credibility issue in his favor on the question of abandonment.

The objection to the Report and Recommendation is **SUSTAINED** and the Motion to Suppress the Evidence is **GRANTED.**