**UNITED STATES of America,** **Plaintiff,**

v.

**Terry COFIELD, Defendant.**

**No. 99–6244–CR.**

United States District Court, S.D. Florida.

Aug. 29, 2002.

court held that this was not the "rare case" where the district judge could reject a magistrate judge's credibility determinations without rehearing the disputed testimony or articulating a basis for rejecting the magistrate's resolution of the issue. *See U.S. v. Cofield,* 272 F.3d 1303, 1306 (11th Cir.2001).

### *Facts*

The two versions of the facts are set out in the opinion entered by this Court and reported at *United States v. Cofield,* 108 F.Supp.2d 1374 (S.D.Fla.2000). All of the facts are not restated here. Only the testimony of the police officers differ in any material respect. An off-duty officer, Agent Jeffrey Leclair, who did not testify at the first hearing and who was present at the scene only as a friend of the lead officer waiting for a noon luncheon engagement, gave testimony which was equivocal at best and was inconsistent with some of the testimony of the other officers as will be explained.

In this case, which arises from a passenger train station stop, the defendant was arrested for possession of a kilogram of cocaine base. Officer Robert Wolfkill testified that he was suspicious of the defendant, a 29–year old African–American male, because he was "acting different from the rest of the passengers in the area." Officer Wolfkill further testified that "law abiding passengers" do not exhibit the type of behavior that the defendant demonstrated on the date of the incident. Officer Wolfkill testified that "normal passengers"

> arrive with families, ... park their cars at the right location, walk onto the platform, go into the office, take care of their arrangements, check their luggage, make contact with employees to ascer-

Lynn Rosenthal, Assistant United States Attorney, Ft. Lauderdale, for U.S.

Patrick M. Hunt, Assistant Federal Public Defender, Ft. Lauderdale, FL, for Terry Cofield.

### *ORDER ON OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION ON THE DEFENDANT'S MOTION TO SUPPRESS*

FERGUSON, District Judge.

This case is before the Court on remand for further proceedings. At issue was whether the defendant had abandoned the contraband-ladened bag. In vacating this Court's Order, which granted the defendant's motion to suppress, the appellate

tain where they are supposed to stand or wait, and they will respond to that area and wait until the train arrives.

When Officer Wolfkill first saw him, at approximately 10:30 a.m., the defendant was walking towards the ticket office. The train was due to leave at 11:29 a.m. Officer Wolfkill testified that the defendant remained at the train station between 10:30 a.m. and 11:00 a.m. The defendant next caught Officer Wolfkill's attention at approximately 11:20 a.m. Prior to that time, the officer asserts the defendant had been on the platform, in the parking lot area, and the office area "the whole time." At 11:20 a.m., the officer saw the defendant walk towards a red Ford Escort and walk back towards the train station with two bags. The officer testified that this act of retrieving the bags was a "very strong indicator" of a need to further an investigation. Officer Wolfkill stated that he had become suspicious earlier because he had not seen the defendant with any luggage and the absence of luggage would be a reason to be suspicious because "normal passengers" carry luggage. When the officer saw the defendant walking back from the parking lot he was accompanied by a female. They proceeded to walk together to the ticket office. This account of defendant's behavior, as described by Officer Wolfkill, appears to fit the behavior of a "normal passenger" as earlier described by the officer: the defendant was accompanied by a female who could have been a family member, he parked his car in the train station's parking lot, he walked onto the platform and headed towards the ticket office and he was carrying luggage. Based on the officer's testimony either set of factual circumstances could give rise to suspicion.

The behavior later exhibited by the defendant and described by the officers as raising suspicion is not unusual behavior for a traveler who is stopped, questioned and asked to submit to a search.[1] It is undisputed in the testimony that the defendant clearly assented to Officer Wolfkill's request to review his train ticket and also consented to a pat town. But when asked for consent to search his bags, the defendant refused and became confrontational and argumentative. He was asked again for consent.[2] It was then, according to Officer Wolfkill, that the defendant "took the bags off the shoulder straps and tossed them on the ground."[3] The officers testified that the defendant dropped the bags and disclaimed ownership. The defendant and his girlfriend testified that the officers blocked the defendant's exit from the train station and took his bags from his physical possession.

Officer Wolfkill testified that he has been a detective for the Hollywood Police Department for about seven (7) years. On October 19, 1999, he had been assigned to the domestic drug interdiction unit for about two-and-a-half (2 1/2) years. Officer Wolfkill further testified that during the performance of his work at the train station he had made a number of warrantless searches and that in ninety-five percent (95%) of the cases he had obtained consent

---

1. The behavior was described as very wide open eyes, standing very still, perspiration about his head, and kind of tongue tied.

2. The testimony of the officers varies but a consensus is that he was asked for his consent to search his bags at least two times.

3. The claim that the defendant was carrying the bags on his shoulders is consistent with the defendant's testimony.

to search. At the first hearing he admitted that he had never sought a warrant in order to search. With regard to the need to obtain warrants, Officer Wolfkill testified, "that's not really the way we conduct ourselves. We further our own investigations to the extent that we can, and if then if we are forced to take that route, [obtain a warrant], we do." Officer Wolfkill admitted to avoiding warrants because obtaining one entails "bogging down the court system, going back to the office and starting paperwork."

At the first hearing before the magistrate judge both Officer Wolfkill and Sergeant Allan Cooperman were clear in their testimony that the defendant twice refused their requests for consent to search his bag. Nevertheless, the investigation continued. At the hearing before this Court the testimony changed ostensibly to fit a new fault theory. Both officers testified in the second hearing that in response to their requests for consent to search, the defendant was "argumentative" and "confrontational" and that he gave no definitive answer to their requests for his consent to search his bags. Officer Cooperman finally conceded however that the defendant did not consent to a search.

Agent Jeffrey Leclair, who did not testify at the first hearing, and who had no official involvement in the case, was called as the government's new witness. He testified that the defendant looked suspicious because he was walking about the platform, in the office area and parking lot looking around "as if he were maybe surveilling the area." Agent Leclair explained that he "acted as a witness" and

"watched the defendant" from the time he arrived at the train station, sometime between 10:30 a.m. and 11:00 a.m., and did not take his eyes off the defendant "for any period of time."[4] But when asked whether he observed the K–9 dog make a hit on the defendant Agent Leclair responded hesitantly that he could not tell if the dog made a hit. The defendant and his girlfriend, Barbara Gibson, testified that they left the train station in her vehicle after the ticket purchase to find an ATM machine in order to make a small withdrawal so that the defendant could buy food while traveling. Their story was corroborated by documentary evidence showing that a withdrawal was made from Gibson's credit union account on the same date from a nearby Hollywood Publix ATM at 11:02 a.m. Agent Leclair's testimony served to explain away the discrepancy between the documentary evidence showing that a withdrawal was made from Gibson's account, the other officers' testimony and the defendant's and Gibson's assertion that they both went to the Publix ATM.

All the officers knew that the defendant was the owner of the searched bags because they saw him carrying them from the vehicle to the train station platform. He was in physical possession of the bags when confronted by the officers. He asserted an ownership interest repeatedly in denying the requests of Officers Wolfkill and Cooperman for consent to search. After he had denied the requests for consent to search the officers continued their efforts in order to gain access to the bags. They told the defendant that a drug-sniffing dog had alerted positively to one of his bags, suggesting that he no longer had a right to refuse permission to search.

---

**4.** Agent Leclair testified that "he didn't want to have any type of active role in [the] investigation." Yet, he "could have bet that [he] was going to be chasing the defendant."

Agent Leclair's assessment as to the probable reaction by defendant, that he would flee, preceded an alleged abandonment.

### *Secretly Recorded Conversation*

A secretly recorded conversation between the defendant and his girlfriend made from the backseat of the police vehicle where they were confined shortly after the arrest corroborated their in-court testimony regarding non-abandonment. In that private conversation, which also contains self-incriminating statements regarding previous drug courier activities, the defendant ponders whether the contraband could have been "pinned" on him had he dropped the bags and walked off. This Court considered the recording as valuable evidence which distinguished the case from others and, along with the testimonial evidence, justified rejecting the magistrate judge's determination.[5] This type of evidence has been used in criminal prosecutions against an accused. *See U.S. v. McKinnon*, 985 F.2d 525 (11th Cir.1993) (denying motion to suppress prearrest portion of conversation secretly recorded while defendant was in backseat of police car). Likewise, suspects have been released from custody when this type of secretly recorded conversation fails to provide the incriminating statements that the police generally expect. *See Pecoraro v. Walls*, 286 F.3d 439 (7th Cir.2002) (releasing suspect after secretly recorded conversation obtained at the request of police failed to provide incriminating evidence of guilt).[6]

### *Conclusion*

Having conducted a full-day evidentiary hearing where the witnesses could be observed for independent credibility determinations, the court finds the government's witnesses unbelievable on the material as well as the collateral facts. The testimony of the defendant and his girlfriend was more consistent with the physical evidence and otherwise more credible. It is the belief of this judge that the facts regarding abandonment were concocted in an effort to salvage a zealous but unconstitutional search and seizure where a warrant was necessary. Considered in totality the government's evidence fits the practice of the lead officer to conduct a warrantless search of the bags of any suspected drug carriers. An alleged platform announcement by one of the officers for the owner of the bags to come forward, to which no one responded, rings hollow as proof of abandonment. It is incredible that in his years of daily drug-interdiction work that Officer Wolfkill had never experienced a need to secure a warrant in order to conduct a luggage search even where consent was refused. It is noteworthy that subsequent to the incident at issue in this case, he has had two (2) occasions to secure a warrant.

The objection to the Report and Recommendation is **SUSTAINED** and the Motion to Suppress the Evidence is **GRANTED**.

---

**5.** Officer Wolfkill acknowledged that the defendant and his girlfriend did not know that their conversations were being recorded. He testified that such evidence, in his opinion, is reliable and has been used by the state in criminal prosecutions.

**6.** The magistrate judge's report and recommendation does not show how much weight, if any, was given to the recording in determining credibility. Neither did the appellate court decide whether the secret recording was sufficient as an articulated basis for dispensing with another evidentiary hearing.